[No. H031120. Sixth Dist. Dec. 19, 2007.]

FOOTHILL-DE ANZA COMMUNITY COLLEGE DISTRICT, Plaintiff, Cross-defendant and Respondent, v.
MELVIN L. EMERICH et al., Defendants, Cross-complainants and Appellants.

COUNSEL

Melvin L. Emerich, Aaron L. Katz: Gary B. Wesley and Aaron L. Katz for Defendants, Cross-complainants and Appellants.

Stradling Yocca Carlson & Rauth, Sean B. Absher and Joseph E. Pelochino for Plaintiff, Cross-defendant and Respondent.

OPINION

**PREMO, J.—**

I. *Introduction*

If a local public entity desires to issue a bond to be repaid by taxes on real property it must generally obtain approval of two-thirds of its voters. (Cal. Const., art. XIII A, § 1, subd. (b)(2).)[1] Proposition 39 reduced the approval requirement to 55 percent for bonds issued by school districts, community college districts, and county offices of education to pay for certain types of projects. The 55 percent approval applies only if the bond proposition submitted to the voters meets the accountability requirements specified by Proposition 39. (Prop. 39, § 4, as approved by voters, Gen. Elec. (Nov. 7, 2000); art. XIII A, § 1, subd. (b)(3).)

On June 6, 2006, voters in Foothill-De Anza Community College District (District) approved a school bond proposition (Measure C) by a vote of 65.69 percent. The District promptly filed an action to validate its resolutions implementing the measure. (Code Civ. Proc., § 860 et seq.) Defendants Melvin L. Emerich and Aaron L. Katz opposed the District's action, arguing that Measure C did not meet the Proposition 39 requirements for approval by 55 percent of the voters. Since the measure had fallen short of a two-thirds vote, defendants maintained that it had not been approved. Katz also argued that the voting scheme, which excluded nonresident property owners from voting on the measure, was unconstitutional. (U.S. Const., 14th Amend., § 1;

---

[1] Further references to article XIII A are to article XIII A of the California Constitution.

Cal. Const., art. I, § 7, subd. (a).) The trial court rejected both arguments and validated the measure. We shall affirm.

## II. *Factual and Procedural Background*

On February 21, 2006, the District's governing board passed a resolution calling for an election to approve the issuance of up to $490.8 million in general obligation bonds. The bonds were to be repaid by a new ad valorem tax levied upon all nonexempt real property within the District's geographical boundaries. The registrar of voters labeled the bond proposal Measure C. The full text of the measure was included in the sample ballot and voter information pamphlet mailed to all registered voters in the District prior to the election.

On June 7, 2006, the day after Measure C was approved by 65.69 percent of voters, the District passed resolutions calling for the issuance of $300 million in bonds. On the same day, the District filed this action to validate the issuance of the bonds called for in the resolutions.

Defendants Emerich and Katz answered and filed cross-complaints. Both defendants claimed that Measure C did not include the accountability provisions required by Proposition 39. Katz also alleged that the election scheme, which enfranchised only natural persons who resided within the District's geographical boundaries, was unconstitutional as applied to him, a nonresident who would be indirectly liable for any new taxes approved by the vote.[2]

The trial court rejected Katz's constitutional arguments, concluding that *Neilson v. City of California City* (2005) 133 Cal.App.4th 1296 [35 Cal.Rptr.3d 453] (*Neilson*), was dispositive. The court also concluded that, although Measure C did not set forth Proposition 39's accountability provisions verbatim, the information it did supply was sufficient. The court entered judgment for the District, validating Measure C and the District's related resolutions, and awarding costs to the District of $1,426.81. Both defendants have appealed.

---

[2] Katz does not reside or pay taxes in the District. He is a general and limited partner of a limited partnership that owns real property located within the District. Nevertheless, the parties stipulated that Katz is an interested person within the meaning of the validation statutes, entitled to respond to the District's validation complaint. Emerich, on the other hand, is a resident of the District and is unquestionably an interested person. (See Code Civ. Proc., §§ 861.1, 863; *Card v. Community Redevelopment Agency* (1976) 61 Cal.App.3d 570, 574–575, fn. 6 [131 Cal.Rptr. 153]; *Regus v. City of Baldwin Park* (1977) 70 Cal.App.3d 968, 972 [139 Cal.Rptr. 196].)

III. *Issues*[3]

1. Did Measure C meet the requirements of Proposition 39 such that only a 55 percent vote was required for its approval?

2. Was the District's voting scheme, which enfranchised only natural persons residing within the District's geographical boundaries, a violation of equal protection principles?

3. Did the trial court err in awarding costs to the District in light of Code of Civil Procedure section 861.1 (hereafter, section 861.1), which provides that a summons in a validation action must include a notice stating that persons who contest the validity of a matter "will not be subject to punitive action"?

IV. *Discussion*

A. *Measure C Included All of Proposition 39's Accountability Requirements*

1. *Standard of Review*

Defendants first argue that Measure C did not include the accountability requirements mandated by Proposition 39. The pertinent facts are not in dispute. There is no question about the contents of the bond proposal that was set forth as the "Full Text Ballot Measure" and submitted to the voters along with a sample ballot in the voter information pamphlet. Our task is to determine whether the bond proposal met the requirements of Proposition 39. Thus, our review involves only a question of law on which we are not bound by the trial court's analysis. (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1502 [82 Cal.Rptr.2d 368].)

 To the extent our review requires interpretation of Proposition 39 or the related statutory provisions, we are guided by settled principles. "In interpreting a voter initiative, we apply the same principles that govern our construction of a statute. [Citation.] We turn first to the statutory language,

---

[3] Defendants also argue that since the registrar of voters did not certify the election results until July 5, 2006, the bond resolutions of June 7, 2006, which are the subject of this action, were premature. As the District points out, although Emerich noted the discrepancy in a footnote in his trial brief, he did not argue the point, nor did either defendant raise the point again until now. Even now, defendants have failed to reply to the District's contention that the issue was not properly raised below. We conclude, therefore, that defendants have waived the issue.

giving the words their ordinary meaning. [Citation.] If the statutory language is not ambiguous, then the plain meaning of the language governs. [Citation.] If, however, the statutory language lacks clarity, we may resort to extrinsic sources, including the analyses and arguments contained in the official ballot pamphlet, and the ostensible objects to be achieved." (*People v. Lopez* (2005) 34 Cal.4th 1002, 1006 [22 Cal.Rptr.3d 869, 103 P.3d 270].)

### 2. *Constitutional and Statutory Requirements*

■ " 'The usual method of funding new school construction in California has been for school districts to obtain voter approval for the issuance of general obligation bonds. . . . The bonds are repaid by an annual levy of an ad valorem tax on real (and certain personal) property located within the area of the district.' " (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1395 [44 Cal.Rptr.3d 128].) Prior to November 2000, article XIII A, section 1 provided that taxes or special assessments levied to pay the interest and redemption charges on "any bonded indebtedness for the acquisition or improvement of real property" must be approved by two-thirds of the voters voting on the proposition. Proposition 39, passed by the voters in 2000, amended article XIII A, section 1, reducing the required approval to 55 percent when the indebtedness was to be incurred by a school district, community college, or county office of education for the "construction, reconstruction, rehabilitation, or replacement of school facilities." (Prop. 39, § 4, as approved by voters, Gen. Elec. (Nov. 7, 2000); art. XIII A, § 1, subd. (b)(3).) The 55 percent standard applies "only if the proposition approved by the voters and resulting in the bonded indebtedness includes all of the following accountability requirements:

"(A) A requirement that the proceeds from the sale of the bonds be used only for the purposes specified in Article XIII A, Section 1(b)(3), and not for any other purpose, including teacher and administrator salaries and other school operating expenses.

"(B) A list of the specific school facilities projects to be funded and certification that the school district board, community college board, or county office of education has evaluated safety, class size reduction, and information technology needs in developing that list.

"(C) A requirement that the school district board, community college board, or county office of education conduct an annual, independent perfor-

mance audit to ensure that the funds have been expended only on the specific projects listed.

"(D) A requirement that the school district board, community college board, or county office of education conduct an annual, independent financial audit of the proceeds from the sale of the bonds until all of those proceeds have been expended for the school facilities projects." (Art. XIII A, § 1, subd. (b)(3).)

Education Code sections 15264 through 15284 implement the initiative. Education Code section 15272 provides: "In addition to the ballot requirements of Section 15122 . . . for bond measures pursuant to this chapter, the ballot shall also be printed with a statement that the board will appoint a citizens' oversight committee and conduct annual independent audits to assure that funds are spent only on school and classroom improvements and for no other purposes." Education Code section 15126 is a global savings provision: "No error, irregularity, or omission which does not affect the substantial rights of the taxpayers within the district or the electors voting at any election at which bonds of any district are authorized to be issued shall invalidate the election or any bonds authorized."

3. *The Ballot*

A sample ballot and voter information pamphlet was mailed to all eligible voters prior to the election. The ballot itself contained the following information:

"Foothill-De Anza College Repair/Job Training Measure: To repair/upgrade Foothill and De Anza Colleges, improve job training/university transfer,

"• Upgrade electrical, heating, ventilation systems, fire/seismic safety,

"• Repair leaky roofs,

"• Improve disabled access,

"• Repair/expand classrooms for nurses/paramedics,

"• Upgrade technology,

"• Repair, construct, acquire, equip buildings, classrooms, libraries, sites, science/computer labs, shall [the District] issue $490.8 million in bonds, at

legal rates, with mandatory audits, citizen oversight and no money for administrators' salaries?"

4. *The Full Text Ballot Measure*

The full text of Measure C, set forth in the voter information pamphlet, included the language that appeared on the ballot and also a lengthy description of the projects for which the bond revenue would be used.[4] In pertinent part, the measure stated:

"The Board of Trustees of the [District], to be responsive to the needs of students and the community, *evaluated the District's urgent and critical facility needs, including facility maintenance, safety issues, class offerings, energy cost reduction and information and computer technology,* in developing the scope of projects to be funded, as outlined in [Facilities Master Plan, the Information Technology Strategic Plan and the Renovation Master Plan, 'as shall be amended from time to time']. . . . The Board conducted facilities evaluations and received public input and review in developing the scope of college facility projects to be funded, as listed in the [foregoing planning documents]. . . . [¶] . . . [¶]

"The Facilities Master Plan, the Information Technology Strategic Plan and the Renovation Master Plan are on file and available for review at the District Chancellor's Office [among other locations]." (Italics added.)

The text describes the projects planned for Foothill and De Anza Colleges and for the District as a whole. The Foothill College projects are divided into six categories: (1) "Upgrade, Maintain, Equip, and/or Replace Obsolete Classrooms, Science and Computer Labs, Library, Instructional Facilities, Sites and Utilities; Meet Demands of Changing Workforce; Improve Disabled Access," (2) "Upgrade Technology," (3) "Repair, Replace and Upgrade Electrical and Mechanical Systems to Reduce Energy Consumption and Utility Bills and Accommodate Computer Technology, Internet Access and Communications Systems, Install Solar Panels to Reduce Energy Consumption and Utility Bills," (4) "Improve Safety and Disabled Access; Remove Asbestos," (5) "Expand Classroom and Facility Capacity, Construct Science Center, Upgrade Classrooms/Labs For Nursing and Emergency Medical Services," and (6) "Improve Emergency Access and Evacuation Routes."

---

[4] The full text of Measure C, as contained in the voter information pamphlet, is set forth in the Appendix.

Except for the third category on the list, each category is followed by a paragraph further explaining the projects contemplated. The explanation attached to the first category is typical. This category of projects would "provide state-of-the-art computer technology capability for students, repair, build, upgrade and/or replace leaky roofs, decaying walls, old ceiling tiles and flooring . . . wire classrooms for computers and other technology, increase energy efficiency, acquire equipment, increase safety, reduce fire hazards with alarms, smoke detectors, fire safety doors and sprinklers." The De Anza and District-wide project descriptions are similar.

Following the two-page list of projects is this paragraph: "Fiscal accountability. The expenditure of bond money on these projects is subject to stringent financial accountability requirements. By law, performance and financial audits will be performed annually, and all bond expenditures will be monitored by an independent citizens' oversight committee to ensure that funds are spent as promised and as specified. . . ." (Underscoring added, capitalization omitted.)

5. *Board Certification, Performance and Financial Audits*

■ In order to qualify as a Proposition 39 school bond measure, the bond proposition must include a "certification" that the District board "has evaluated safety, class size reduction, and information technology needs" in developing its list of projects. (Art. XIII A, § 1, subd. (b)(3)(B).) Defendants argue that Measure C omitted this certification. Not so. The District's proposition clearly states that the District board "evaluated" the District's facility needs, "including facility maintenance, safety issues, class offerings, energy cost reduction and information and computer technology" in deciding upon the scope of the projects to be funded. Defendants do not describe what they claim was omitted. Accordingly, we reject the argument.

Proposition 39 also demands that a school bond proposal include the requirement that the District "conduct an annual, independent performance audit" and "an annual, independent financial audit." (Art. XIII A, § 1, subd. (b)(3)(C), (D).) Defendants claim the Measure C omitted these requirements. Again, we disagree. The proposition meets the constitutional requirements in that it states: "By law, performance and financial audits will be performed annually." True, the statement does not say who will perform the audits, but the Constitution does not require the District to identify the auditor. It is also true that the statement does not say that the audits will be "independent." This omission is insubstantial. The word "audit" connotes

an independent inspection. (See, e.g., Concise Oxford English Dict. (11th ed. 2004) p. 86, col. 1, which defines audit as "an official inspection of an organization's accounts, typically by an independent body.")

## 6. *List of Projects*

A large part of defendants' appeal is directed toward the list of projects the bond proceeds are intended to fund. Defendants claim that list of projects included in the full text ballot proposition merely sets forth categories of projects and is not specific enough to meet the requirements of Proposition 39. We must first decide what level of specificity Proposition 39 requires.

The plain language of the constitutional provision added by Proposition 39 is that the bond proposal must contain, "[a] list of the specific school facilities projects to be funded and certification that the school district board . . . has evaluated safety, class size reduction, and information technology needs in developing that list." Since this language sheds no light on just how specific Proposition 39 expects the list to be, we turn to the publisher's historical note for article XIII A, section 1, which contain the purpose and intent of the Proposition 39 ballot initiative.

The overall purpose of the initiative was "to prepare our children for the 21st Century, to implement class size reduction, to ensure that our children learn in a secure and safe environment, and to ensure that school districts are accountable for prudent and responsible spending for school facilities . . . ." (Note, Deering's Ann. Cal. Const. (2007 supp.) foll. art. XIII A, § 1; see art. XIII A, § 3.) The initiative was to accomplish the first three of these purposes by allowing for a less than two-thirds approval of bond measures to fund school projects. The type of projects the initiative was intended to encourage is revealed by its requirement that school districts evaluate "safety, class size reduction, and information technology needs" in developing the list of projects to present to the voters for approval. The accountability goal is achieved by requiring that, "before they vote, voters will be given a list of specific projects their bond money will be used for," and by requiring annual, independent financial and performance audits. (*Id.*, subds. (a)–(d).) In other words, the initiative was intended to make it easier to pass school bonds, the proceeds of which would be used to upgrade school facilities, reduce class size, and improve safety, and to ensure that district boards actually spent the bond proceeds on the projects the voters approved. That means that the list of projects submitted to the voters must be specific enough that the voters know what it is they are voting for and the auditors know how to evaluate the

district's performance. As the trial court summarized so articulately, "The critical factor in assessing whether the project list complied with Proposition 39 is whether it allows for meaningful approval and oversight of the bond expenditures . . . ." Thus, if the list defines or identifies the projects in a manner that clearly apprises the voters, the auditors, and the public oversight committees of the types of projects for which the money is intended to be used, that is sufficient.

■ The list of projects set forth in Measure C clearly identifies the types of projects to be funded. For example, it is clear that among the projects to be funded are repair or replacement of leaky roofs, wiring classrooms for computers and other technology, and installation of fire safety doors and sprinklers. This is sufficiently specific for meaningful approval and oversight. Defendants urge a level of specificity that is impractical and unnecessary. Surely it is unnecessary to inform the voter which buildings will receive new fire safety doors or which roofs will be replaced and which will be repaired. That is minutiae that the voter has no expertise or need to consider. Furthermore, requiring such minute detail as defendants propose would be impractical. By the time the District is assured of the bond proceeds, the roof that might have been repaired may now need to be replaced; or safety and accessibility renovations may need to be revised to comply with changing regulations. It is sufficient that the District clearly identified the particular types of projects, such as roof repair or installation of safety equipment. Those are the projects the voters approved and those are the projects any overseer will look for in determining whether the District is using the bond funds as proposed.

Defendants claim that the list places no limits on the types of projects because the list allowed for future changes. Defendants also contend that the "actual" list of projects the District plans to implement with bond money is that contained in the 2006 Bond Measure Cost Summary, which was an exhaustive list of projects the District used in planning the bond proposal. Defendants maintain that this list was not available to the voters and that it includes projects that are not proper subjects of a Proposition 39 bond and projects that were not listed in the bond proposal. These arguments are beside the point. The voters approved the bond proposition that was printed in the voter information pamphlet. Any future changes would have to be consistent with the projects specified in the proposition the voters approved. In the event the District exceeds the authority granted by the voters' approval, the Legislature has provided a separate remedy. (Ed. Code, § 15284.)

B. *The Voting Scheme Was Constitutional*

Katz had argued below that the voting scheme the District used was unconstitutional as applied to him. (U.S. Const., 14th Amend., § 1; Cal.

Const., art. I, § 7, subd. (a).) Katz does not live in the District but he is the general partner of a limited partnership that owns real property in the District. The vote on Measure C was limited to registered voters residing in the District and, therefore, Katz was precluded from voting. He claimed this was an equal protection violation because he will be indirectly liable for any tax the voters approve.

Prior to trial, the District made an in limine motion, seeking exclusion of all evidence challenging the voting scheme's validity. The trial court granted the motion, concluding that *Neilson, supra*, 133 Cal.App.4th 1296, was dispositive of the question. Katz challenges this ruling on appeal, urging this court to disagree with *Neilson*. We agree with *Neilson* and find no error in the trial court's ruling.

In *Neilson*, a nonresident landowner challenged a city's flat-rate parcel tax approved by the city's registered voters. Like Katz, Neilson claimed that excluding him from the vote was a denial of equal protection. (*Neilson, supra*, 133 Cal.App.4th at pp. 1301, 1314.) *Neilson* noted that, in general, residency is an acceptable restriction on the franchise. (*Id.* at pp. 1314–1315, quoting the discussion in *Hoffman v. State Bar of California* (2003) 113 Cal.App.4th 630, 644–645 [6 Cal.Rptr.3d 592].) *Neilson* also cited *Holt Civic Club v. Tuscaloosa* (1978) 439 U.S. 60 [58 L.Ed.2d 292, 99 S.Ct. 383] (*Holt*), in which the United States Supreme Court rejected an equal protection challenge to a city's residency requirement by nonresidents who were subject to certain city regulations and licensing requirements. (*Neilson, supra*, 133 Cal.App.4th at p. 1315.) In rejecting the challenge, *Holt* summarized prior cases that had found other types of voting qualifications to be unconstitutional: "The challenged statute in each case denied the franchise to individuals who were physically resident within the geographic boundaries of the governmental entity concerned. [Citations.] No decision of this Court has extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions. On the contrary, our cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." (*Holt, supra*, 439 U.S. at pp. 68–69.)

After reviewing *Holt* and other pertinent United States Supreme Court authority, *Neilson* rejected the plaintiff's contention that strict scrutiny should apply, concluding that strict scrutiny applied only "to protect the right to vote of those who are *otherwise qualified to vote*. Someone otherwise qualified to vote could be characterized as having a 'fundamental' interest in the right to vote, which may not be infringed absent a compelling state interest. But strict

scrutiny is not used to create a right to vote in nonresidents who are not otherwise qualified." (*Neilson, supra,* 133 Cal.App.4th at p. 1315.)

Like the plaintiff in *Neilson,* Katz is not an "otherwise qualified" voter in any District election. A person qualifies generally as a voter if he or she is a United States citizen at least 18 years of age residing in the state. (Cal. Const., art. II, § 2.) If such a person complies with the registration requirements of the Elections Code he or she "may vote at any election held *within the territory within which he or she resides* and the election is held." (Elec. Code, § 2000, italics added.) Since Katz does not reside in and is not a registered voter of the District, he is not otherwise qualified to vote there. Article XIII A, section 1, subdivision (b)(3) supports this conclusion as it applies to the District's school bond elections in that this subdivision allows for approval of school bonds "by 55 percent of the *voters of the district.*" (Italics added.) Thus, the District's voting scheme did not deprive Katz of a fundamental right warranting strict scrutiny review.

Citing *California Bldg. Industry Assn. v. Governing Bd.* (1988) 206 Cal.App.3d 212, 220 [253 Cal.Rptr. 497] (*California Bldg.*), Katz argues that qualified electors are the persons who, like him, are going to actually pay the tax. Katz misreads the case. In *California Bldg.,* the electorate of a school district voted to impose a tax upon building permits issued within the district. The tax was purportedly approved pursuant to article XIII A, section 4, which provides that cities, counties and special districts, by a two-thirds vote of the electorate, may impose special taxes " 'on such district.' " (*California Bldg., supra,* 206 Cal.App.3d at p. 237.) The court held that the constitutional requirement that the tax be imposed " 'on such district' " meant that the voters' approval was limited to taxes they themselves would have to pay, either directly or indirectly. (*Id.* at p. 238.) Allowing an electorate to approve a tax to be paid by someone else entirely, such as builders seeking permits to build within district boundaries, would make the constitutionally imposed difficulty of a two-thirds vote meaningless. (*Ibid.*) "In contrast, requiring the tax to be imposed directly or indirectly on the electorate to whom the tax was submitted will give effect to the limitation on new taxes which the supermajority requirement seeks to insure." (*Ibid.*) *California Bldg.* did not suggest that the electorate must include every person who will be affected by the tax. The case does not alter our conclusion that Katz was not otherwise qualified to vote in the District election at issue.

Applying the rational basis test, *Neilson* concluded that the residency requirement used to define the electorate in that case did not offend equal protection principles. In so doing, the court cited a discussion from an analogous case, *Massad v. New London* (1993) 43 Conn. Supp. 297 [652 A.2d 531]. In *Massad,* nonresidents who owned property in the city challenged a

residency requirement pertaining to a city-wide referendum to approve a budget and tax rate ordinance. The court determined that there was a rational basis for excluding nonresidents, which was that local residents had a greater knowledge and interest in local affairs, while nonresident property owners would mainly be interested in lower taxes. (*Neilson, supra*, 133 Cal.App.4th at p. 1317, citing *Massad v. New London, supra*, 652 A.2d at p. 538.) The same rational basis exists here. The voting scheme did not offend Katz's right to equal protection.

## C. *Costs*

Following trial the District moved for an award of costs. Defendants challenged the motion and the trial court taxed some of the costs requested but allowed a total of $1,426.81. Defendants argue that this was error. Defendants contend that the trial court erred in awarding costs against them because section 861.1 requires that the summons in a validation action "shall also state that persons who contest the legality or validity of the matter will not be subject to punitive action, such as wage garnishment or seizure of their real or personal property." Defendants claim that the cost award is "punitive action" and, therefore, it is prohibited by section 861.1. Defendants also argue that the District is estopped from seeking a judgment allowing it to garnish or seize their property since they relied to their detriment upon the advisement in the summons, which said that they would not be subject to punitive action, such as wage garnishment or seizure of their real or personal property.

We do not agree that a judgment awarding costs to a prevailing party is a "punitive action" against the loser. A cost award is not imposed as a punishment. In general, the loser in any civil action is liable for costs, notwithstanding the good faith of his or her claim or defense. (Code Civ. Proc., § 1032, subd. (b).) A cost award does, however, result in a judgment in favor of the party to whom the costs were awarded, which presumably could be enforced by wage garnishment or other seizure mechanisms. To that extent, section 861.1 might be read to preclude an award of costs against the challenger in a validation action. If it does, it conflicts with Code of Civil Procedure section 868 (hereafter, section 868), which provides: "The costs of any proceeding or action pursuant to this chapter [Validating Proceedings] may be allowed and apportioned between the parties or taxed to the losing party in the discretion of the court." The issue, therefore, is whether an award of costs against persons who contest the validity of a matter is prohibited by section 861.1 or allowed under section 868.

The issue requires our interpretation of the law, a core judicial function to which we apply our independent review. (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 470 [20 Cal.Rptr.3d 428, 99 P.3d

1015].) In so doing, we rely upon settled rules. Our fundamental task is to ascertain the intent of the Legislature. (*People v. Connor* (2004) 115 Cal.App.4th 669, 678 [9 Cal.Rptr.3d 521].) We do that by first examining the statutory language, giving the words their usual and ordinary meaning. If there is no ambiguity the plain meaning governs. (*Ibid.*) If the statutory language permits more than one reasonable interpretation, we may resort to extrinsic aids, including the rules of statutory construction and consideration of the evils to be remedied by the statutory scheme at issue, to help us select the interpretation that comports most closely with the lawmakers' intent. (*Ibid.*) "[A] specific provision should be construed with reference to the entire statutory system of which it is a part, in such a way that the various elements of the overall scheme are harmonized." (*Bowland v. Municipal Court* (1976) 18 Cal.3d 479, 489 [134 Cal.Rptr. 630, 556 P.2d 1081].) Furthermore, statutes are to be interpreted by assuming that the Legislature was aware of the existing law at the time of the enactment and to have enacted a statute in light thereof. (*People v. McGuire* (1993) 14 Cal.App.4th 687, 694 [18 Cal.Rptr.2d 12].)

Section 861.1 plainly states that the summons shall inform interested persons that they will not be subject to punitive action such as wage garnishment or seizure of their property. We have no doubt that the Legislature intended, by requiring this notice to be included in the summons, to assure interested persons that they could challenge the action of a public entity without fear of incurring a liability they did not intend. But the legislative history, of which we have taken judicial notice, provides no insight into whether the Legislature intended to immunize interested persons from having costs awarded against them in the event they lose their challenge. (See Assem. Com. on Judiciary, Rep. on Assem. Bill No. 2049 (1997–1998 Reg. Sess.) Apr. 28, 1998; Sen. Judiciary Com., Rep. on Assem. Bill No. 2049 (1997–1998 Reg. Sess.) July 21, 1998; Sen. Rules Com., Rep. on Assem. Bill No. 2049 (1997–1998 Reg. Sess.) as amended July 29, 1998.)

Defendants cite *City of Long Beach v. Bozek* (1982) 31 Cal.3d 527 [183 Cal.Rptr. 86, 645 P.2d 137] (*Bozek*), in support of their contention that a cost award is inconsistent with a public policy of encouraging citizens to speak out about government action. *Bozek* does not support the point. *Bozek* held that governmental entities may not sue private citizens for malicious prosecution. In so holding, the Supreme Court discussed the paramount importance of protecting the constitutionally guaranteed right to petition the government for the redress of legitimate grievances (U.S. Const., 1st Amend.; Cal. Const., art. I, § 3) and concluded that the risk of having to defend a malicious prosecution action would chill that right. The court did not prohibit an award of costs. Indeed, the court noted there were remedies other than a malicious prosecution suit, such as Code of Civil Procedure section 128.5, which allow governmental entities to regain costs and expenses expended in defending

baseless claims. (*Bozek, supra*, 31 Cal.3d at pp. 537–538.) The existence of these other remedies weighed against approving the use of a malicious prosecution action. Thus, the case does not hold that taxing costs to the individual challenging the public action is inconsistent with any public policy or constitutional right.

■ There is one situation where the challenger in a validation action cannot be liable for costs and that is when the action may be characterized as a challenge to an eminent domain proceeding, such as a landowner's challenge to redevelopment plans that would condemn the landowner's property. (*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 70 [37 Cal.Rptr. 74, 389 P.2d 538] (*Bunker Hill*).) That rule is based upon the challenger's right to just compensation under the Fifth Amendment of the United States Constitution. (*San Francisco v. Collins* (1893) 98 Cal. 259, 262–263 [33 P. 56].) But where there is no issue of the right to take private property for public use, this rule does not apply. (Cf. *Crum v. Mt. Shasta Power Corp.* (1932) 124 Cal.App. 90, 95 [12 P.2d 134].)

Turning back to the statutes at hand, we note that section 868 was in effect in 1998 when the Legislature amended section 861.1. We presume, therefore, that the Legislature was aware when it added the no-punitive-action advisement to section 861.1 that the trial court had discretion to tax costs to the losing party under section 868. The Legislature must also have been aware of the judicially created rule preventing costs to be taxed to the challenger in certain validation proceedings. (*Bunker Hill, supra*, 61 Cal.2d at p. 70.) If the Legislature had intended to extend that prohibition to all challengers in validation actions, it could have revised section 868 to do that. Since the Legislature amended section 861.1 without amending section 868, we are persuaded that the Legislature did not intend to change the plain meaning of the latter section, i.e., that the court may award costs in its discretion.

■ Finally, defendants argue that even if costs may properly be taxed to them, the trial court abused its discretion in awarding nonrecoverable costs. In ruling upon a motion to tax costs, the trial court's first determination is whether the statute expressly allows the particular item and whether it appears proper on its face. "If so, the burden is on the objecting party to show [the costs] to be unnecessary or unreasonable." (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 131 [84 Cal.Rptr.2d 753].) Where costs are not expressly allowed by the statute, the burden is on the party claiming the costs to show that the charges were reasonable and necessary. (*Id.* at p. 132.) "Whether a cost item was reasonably necessary to the litigation presents a question of

fact for the trial court and its decision is reviewed for abuse of discretion." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774 [23 Cal.Rptr.2d 810].)

 Defendants challenge $140 in witness fees for the District's Vice-Chancellor Brandy and Chancellor Kanter, arguing that these witnesses were, in effect, parties, and that Kanter never actually testified. The claim is meritless. *Trussell v. City of San Diego* (1959) 172 Cal.App.2d 593, 617 [343 P.2d 65], held that, although mileage and witness fees are not allowable to parties to the action, there is no authority to deny fees to individuals " 'not shown to have any private interest in the litigation, merely because they are directors or employees of a corporate party.' " *County of Kern v. Ginn* (1983) 146 Cal.App.3d 1107, 1112–1113 [194 Cal.Rptr. 512], applied the same rationale to governmental litigants. Brandy and Kanter were not parties, they were employees of District and entitled to fees. It is immaterial that Kanter did not actually testify. Code of Civil Procedure section 1033.5, subdivision (a)(7) provides that ordinary witness fees pursuant to section 68093 of the Government Code are recoverable as costs in a civil proceeding. Government Code section 68093 provides fees for witnesses "legally required to attend a civil action or proceeding in the superior courts." Kanter was legally required to be present due to defendants' notice to the District to produce him.

 Defendants challenge $116.25 in overnight messenger fees. Costs for courier or messenger fees are not specifically enumerated as allowable costs in Code of Civil Procedure section 1033.5, subdivision (a), neither are they prohibited in section 1033.5, subdivision (b). Thus, messenger fees may be recoverable in the trial court's discretion if "reasonably necessary to the conduct of the litigation." (Code Civ. Proc., § 1033.5, subd. (c)(2); *Ladas v. California State Auto. Assn., supra*, 19 Cal.App.4th at p. 776.) The District explained that same day messenger service fees were necessary to file its supplemental brief and a peremptory challenge to the assigned trial judge. The trial court impliedly found the fees to be necessary and reasonable and not merely incurred for convenience. The trial court did not abuse its discretion in awarding these fees.

 Lastly, defendants contest $53.40 in travel costs for Brandy's deposition. Code of Civil Procedure section 1033.5, subdivision (a)(3), specifically allows travel costs to attend depositions. Defendants claim that Brandy did not have to travel for his deposition since it was taken at his office, but travel costs would also apply to costs incurred by counsel. The trial court accepted counsel's declaration stating that the costs were reasonable and necessary. Defendants offer no basis upon which to conclude that this decision was an abuse of discretion.

## V. *Disposition*

The judgment is affirmed.

Rushing, P. J., and Elia, J., concurred.

A petition for a rehearing was denied January 11, 2008, and appellants' petition for review by the Supreme Court was denied March 26, 2008, S160361. Kennard, J., was of the opinion that the petition should be granted.

APPENDIX

**COMPLETE TEXT OF MEASURE C**

FULL TEXT BALLOT PROPOSITION

OF THE FOOTHILL-DE ANZA COMMUNITY COLLEGE
DISTRICT BOND MEASURE ELECTION JUNE 6, 2006

**Foothill-De Anza College Repair/Job Training Measure:** "To repair/upgrade
Foothill and De Anza Colleges, improve job training/university transfer,

- Upgrade electrical, heating, ventilation systems, fire/seismic safety,

- Repair leaky roofs,

- Improve disabled access,

- Repair/expand classrooms for nurses/paramedics,

- Upgrade technology,

- Repair, construct, acquire, equip buildings, classrooms, libraries, sites,
 science/computer labs, shall [the District] issue $490.8 million in bonds,
 at legal rates, with mandatory audits, citizen oversight and no money for
 administrators' salaries?"

**Bonds—Yes** **Bonds—No**

**PROJECTS**

The Board of Trustees of the Foothill-De Anza Community College
District, to be responsive to the needs of students and the community,
evaluated the District's urgent and critical facility needs, including facility
maintenance, safety issues, class offerings, energy cost reduction and infor-
mation and computer technology, in developing the scope of projects to be
funded, as outlined in both the District's Foothill College Facility Master
Plan, as updated in October 2002, as amended in February 2006, and as shall
be amended from time to time, and the De Anza College Facility Master
Plan, as updated in October 2002, as amended in February 2006, and as shall
be amended from time to time (together, the "Facilities Master Plan"), as well

as the District's Information Technology Strategic Plan 2005-2010, represented to the Board on January 17, 2006, and as shall be amended from time to time. In developing the scope of projects, the faculty, staff and students have prioritized the key health and safety needs so that the most critical needs and the most urgent and basic repairs that will make both campuses clean and safe for learning are addressed. The Board conducted facilities evaluations and received public input and review in developing the scope of college facility projects to be funded, as listed in the Facilities Master Plan, the Information Technology Strategic Plan and the Renovation Master Plan. This input of faculty and community leaders concluded that if these needs were not addressed now, the problems would only get worse. **In preparing the Facilities Master Plan, the Information Technology Strategic Plan and the Renovation Master Plan, the Board of Trustees made five important determinations:**

(i) **Foothill-De Anza Community College District must upgrade and expand inadequate facilities to address increased student demand for classes;**

(ii) **In tough economic times, both Foothill College and De Anza College must provide programs to train people who need to acquire or upgrade job skills;**

(iii) **Foothill College and De Anza College must provide affordable educational opportunities, adequate facilities and classes for academic programs for students who want to transfer to four-year colleges;**

(iv) **Foothill-De Anza Community College District must upgrade classrooms and labs so that they are safe from asbestos and other hazards and meet the standards of a modern curriculum; and**

(v) **Foothill-De Anza Community College District must upgrade its old buildings to provide energy efficient electrical systems for today's technology systems and upgrade campus lighting for increased safety and security on campus.**

The Facilities Master Plan, the Information Technology Strategic Plan and the Renovation Master Plan are on file and available for review at the District Chancellor's Office and Public Information Office, as well as at the offices of the Presidents of Foothill College and De Anza College, and include the projects listed below.

## FOOTHILL COLLEGE

- **Upgrade, Maintain, Equip, and/or Replace Obsolete Classrooms, Science and Computer Labs, Library, Instructional Facilities, Sites and Utilities; Meet Demands of Changing Workforce; Improve Disabled Access:**

 Upgrade buildings to include educational equipment and laboratories, provide state-of-the-art computer technology capability for students, repair, build, upgrade and/or replace leaky roofs, decaying walls, old ceiling tiles and flooring, plumbing, sewer and drainage systems, inefficient electrical systems and wiring, deteriorated restrooms, heating, ventilation and cooling systems, foundations, telecommunications systems, classrooms, lecture halls, language labs, fields, courts and grounds, science and other instructional laboratories and healthcare workforce facilities, technology center, theatre, library, administrative facilities, instructional facilities, wire classrooms for computers and other technology, increase energy efficiency, acquire equipment, increase safety, reduce fire hazards with alarms, smoke detectors, fire safety doors and sprinklers, reduce operating costs in order for more classes and job training to be offered, improve academic instruction; and meet legal requirements for disabled access.

- **Upgrade Technology:**

 Provide state-of-the-art technology facilities, upgrade internet access and wireless and cable technology, build "smart classrooms" to improve technology-enhanced learning, upgrade telecommunications systems, upgrade campus-wide technology, including a new Educational Information System, replace outdated computers, replace network infrastructure equipment, and install wiring upgrades.

- **Repair, Replace and Upgrade Electrical and Mechanical Systems to Reduce Energy Consumption and Utility Bills and Accommodate Computer Technology, Internet Access and Communications Systems, Install Solar Panels to Reduce Energy Consumption and Utility Bills**

- **Improve Safety and Disabled Access**

 Remove all harmful asbestos, upgrade existing fire alarms, sprinklers, smoke detectors, and fire doors. Install security systems, exterior lighting, emergency lighting, signage, door locks and fences, enhance erosion controls, repair uneven sidewalks and walkways and improve accessibility for the disabled.

- **Expand Classroom and Facility Capacity, Construct Science Center, Upgrade Classrooms/Labs For Nursing and Emergency Medical Services:**

 Increase permanent classroom and facility capacity for academic and job training classes, including math and health care programs, upgrade science labs, physical and health education, and applied arts and sciences facilities, upgrade campus technology and construct "smart classrooms" to improve technology-enhanced learning.

- **Improve Emergency Access and Evacuation Routes:**

 Improve campus road network and surfacing, build parking structure, reduce gridlock, improve pedestrian safety and increase access for emergency vehicles.

## DE ANZA COLLEGE

- **Upgrade Technology:**

 Provide state-of-the-art technology facilities, upgrade internet access and wireless and cable technology, build "smart classrooms" to improve technology-enhanced learning, upgrade telecommunications systems, upgrade campus-wide technology, including a new Educational Information System, replace outdated computers, replace network infrastructure equipment, and install wiring upgrades.

- **Repair, Upgrade, Equip, and/or Replace Obsolete Classrooms, Science, Nursing, Computer and Instructional Laboratories and Other Facilities, Sites and Utilities:**

 Repair, upgrade and/or replace leaky roofs, decaying walls, old ceiling tiles and flooring, plumbing, sewer and drainage systems, inefficient electrical systems and wiring, deteriorated restrooms, heating, ventilation and cooling systems, foundations, telecommunications systems, data center, bookstore, foundations, fields and grounds, library, classrooms, lecture halls, science, engineering and other laboratories, physical and healthcare workforce education and auto technology facilities, television studio and other faculty, administrative and instructional facilities, corporation yard, and multicultural center, wire classrooms for computers and technology upgrade Campus Center, increase safety, increase energy efficiency, acquire equipment, reduce fire hazards, reduce operating costs in order for more classes and job training to be offered, improve academic instruction, and meet legal requirements for disabled access.

- **Improve Emergency Access and Evacuation Routes; Improve Access for Disabled:**

 Improve student safety, improve campus road network to eliminate unsafe conditions, reduce gridlock, improve pedestrian safety and increase access for emergency vehicles, upgrade parking garage and parking areas, improve disabled access, add parking structure to accommodate increasing student population and reduce congestion.

- **Improve Safety and Disabled Access; Remove Asbestos; Perform Seismic Upgrades:**

 Remove all harmful asbestos, upgrade existing gas lines, pipes, sewer system, storm drains, fire alarms, sprinklers, smoke detectors, intercoms and fire doors, Install security systems, exterior lighting, emergency lighting, signage, door locks and fences, repair uneven sidewalks and walkways, upgrade facilities for seismic safety.

- **Repair, Replace and Upgrade Electrical and Mechanical Systems and Install Solar Panels to Reduce Energy Consumption and Utility Bills and Accommodate Computer Technology, Internet Access and Communications Systems.**

- **Construct Academic Facilities to Expand Classroom and Laboratory Capacity:**

 Increase permanent classroom, laboratory space and facility capacity for academic and job training classes, including math, science, student support services, instructional labs, physical and health education and applied arts and sciences, campus technology, construct "smart classrooms" for enhanced learning.

## DISTRICT-WIDE PROJECTS

- **Provide greater access to technology; upgrade electrical wiring, Internet access, wireless and cable technology, fiber optics and network infrastructure for computers and telecommunication systems at both Foothill College and De Anza College campuses.**

- **Refinance existing lease obligations.**

- **Acquire property for new education center to accommodate growing population and to better serve new populations in the District.**

- **Build data center to support new District-wide computer and technology systems and integrate with renovated central office facility.**

Listed building, repair and rehabilitation projects and upgrades will be completed as needed. Each project is assumed to include its share of furniture, equipment, architectural, engineering, and similar planning costs, programs management, staff training expenses and a customary contingency for unforeseen design and construction costs. The allocation of bond proceeds will be affected by the District's receipt of State bond funds and the final costs of each project. The budget for each project is an estimate and may be affected by factors beyond the District's control. The final cost of each project will be determined as plans are finalized, construction bids are awarded and projects are completed. Based on the final costs of each project, certain of the projects described above may be delayed or may not be completed. In such case, bond money will be spent on only the most essential of the projects listed above.

**FISCAL ACCOUNTABILITY. THE EXPENDITURE OF BOND MONEY ON THESE PROJECTS IS SUBJECT TO STRINGENT FINANCIAL ACCOUNTABILITY REQUIREMENTS. BY LAW, PERFORMANCE AND FINANCIAL AUDITS WILL BE PERFORMED ANNUALLY, AND ALL BOND EXPENDITURES WILL BE MONITORED BY AN INDEPENDENT CITIZENS' OVERSIGHT COMMITTEE TO ENSURE THAT FUNDS ARE SPENT AS PROMISED AND AS SPECIFIED. THE CITIZENS' OVERSIGHT COMMITTEE MUST INCLUDE, AMONG OTHERS, REPRESENTATION OF A BONA FIDE TAXPAYERS' ASSOCIATION, A BUSINESS ORGANIZATION AND A SENIOR CITIZENS' ORGANIZATION. NO DISTRICT EMPLOYEES OR VENDORS ARE PERMITTED TO SERVE ON THE CITIZENS' OVERSIGHT COMMITTEE.**

NO ADMINISTRATOR SALARIES. PROCEEDS FROM THE SALE OF THE BONDS AUTHORIZED BY THIS PROPOSITION SHALL BE USED ONLY FOR THE CONSTRUCTION, RECONSTRUCTION, REHABILITATION, ACQUISITION OR REPLACEMENT OF COLLEGE FACILITIES, INCLUDING THE FURNISHING AND EQUIPPING OF COLLEGE FACILITIES, AND NOT FOR ANY OTHER PURPOSE, INCLUDING TEACHERS' AND ADMINISTRATORS' SALARIES AND OTHER OPERATING EXPENSES. BY LAW, ALL FUNDS CAN ONLY BE SPENT ON REPAIR AND IMPROVEMENT PROJECTS.

[Tax Rate Statement Omitted]

/s/ Martha Kanter
 Chancellor
 Foothill-De Anza Community College District