Filed 9/23/25  Riversiders Against Increased Taxes v. Riverside Unified School Dist. CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| RIVERSIDERS AGAINST INCREASED TAXES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> RIVERSIDE UNIFIED SCHOOL DISTRICT et al., <br><br> Defendants and Respondents. | G064305 <br><br> (Super. Ct. No. CVRI2303571) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Godofredo Magno, Judge. Affirmed.

Law Office of Chad D. Morgan and Chad D. Morgan for Plaintiff and Appellant.

Fozi Dwork & Modafferi, Golnar J. Fozi, and Daniel S. Modafferi for Defendants and Respondents.

Proposition 39, passed in November 2000, amended article XIII A, section 1 of the California Constitution to provide exceptions to the one percent cap on ad valorem real property taxes. The exceptions include school bonds issued for "the construction, reconstruction, rehabilitation, or replacement of school facilities." (Cal. Const., art. XIII A, § 1, subd. (b)(3).) If such school bond propositions meet certain enumerated "accountability requirements," they may be enacted with 55 percent of the vote, rather than the normal two-thirds majority vote required for bonds to fund acquisition and improvement of real property. (*Id.*, subds. (b)(2) & (3).)

In this case, we are tasked with determining whether a school bond measure, Measure O, approved in November 2016 by more than two-thirds of the voters in the Riverside Unified School District (RUSD) meets two of these accountability requirements. The first requirement is that the ballot initiative provide a "list of the specific school facilities projects to be funded." (Cal. Const., art. XIII A, § 1, subd. (b)(3)(B).) The second is that the school board must certify it has "evaluated safety, class size reduction, and information technology needs in developing that list." (*Ibid.*)

Plaintiff is a taxpayer group, Riversiders Against Increased Taxes (RAIT), which filed suit under Education Code section 15284 against RUSD in 2023, seeking to enjoin the use of Measure O funds for new school construction.[1] RAIT argued the use was improper under Proposition 39 because Measure O did not apprise voters the bond funds might be used for new school construction. Like the trial court, we reject RAIT's argument.

---

[1] All statutory references are to the Education Code unless otherwise indicated.

2

We conclude Measure O passes muster under Proposition 39's accountability requirements. Measure O's project list expressly contemplated and disclosed the use of funds for new school construction, and the school board properly certified that it considered safety, class size reduction, and information technology needs in developing the project list.

We affirm the judgment.

STATEMENT OF FACTS

On June 20, 2016, the RUSD Board of Education (Board) adopted a resolution to place a $392 million bond measure on the November 8, 2016 ballot. The text of the ballot question read as follows: "To repair and upgrade Riverside schools, including deteriorating roofs, plumbing and electrical systems, improve student safety, security, and seismic safety, upgrade classrooms, science labs, career-training facilities, computer systems and instructional technology to support student achievement in math, science, engineering and skilled trades, and *construct*, acquire, repair *classrooms, sites, facilities* and equipment, shall [RUSD] issue $392 million in bonds at legal rates, with citizen oversight, no money for administrator salaries, all money staying local?" (Italics added.)

Following the ballot question, Measure O provided the voters a two-page description of the types of projects for which the bond funds could be used. Under the heading "PROJECT LIST," it began with a preamble stating the Board had "evaluated the District's urgent and critical facility needs, including safety issues, class size, computer and information technology, enrollment trends" and had prepared (and adopted) a facilities master plan, which it incorporated by reference. It went on to state, "[t]he District conducted a facilities evaluation and received public input in developing this [p]roject [l]ist." It then identified several objectives the Board

3

deemed paramount. Among them were "[u]pgrad[ing] or *replac[ing] aging school infrastructure, classrooms and school buildings*," "[m]oderniz[ing] school facilities to improve access for students with disabilities," and "[p]rovid[ing] classroom and labs for career and technical education classes . . . . " (Italics added.) The Board stated it intended to appoint an independent citizens oversight committee (COC) "to ensure that all funds [we]re spent only as authorized."

The ballot measure then stated, "The Project List includes the following types of upgrades and improvements at District school and sites"— followed by a discussion of three categories of work included in the project list. The first category, "Improving Student Learning: Basic School Repair and Upgrade Projects,"[2] explained this work was to focus on upgrading buildings and facilities, many of which were built "more than 40 years ago" and needed "basic repairs, including roofs, plumbing and electrical systems, and other projects." It went on to explain these "other projects" included "[r]epair[ing] or [r]eplac[ing] *outdated classrooms and school buildings* with safe, modern facilities," "[p]artner[ing] with U.C. Riverside and Riverside City College *to build* a Center for the Study of Advanced Science, Technology, Engineering and Math" (the STEM education center), and "build[ing] new classrooms and facilities to relieve overcrowding." (Italics added.)

Following the three listed categories of work was a further description and discussion of the projects for which the funds would be used. It stated: "*In addition to the projects listed above*, the repair and renovation of each of the existing school facilities may include, but not be limited to, some

---

[2] The other two listed categories were "Improving School Safety: Safety, Security and Energy Efficiency Projects," and "21st Century Learning for 21st Century Careers: District-Wide Instructional Technology Projects."

4

or all of the following: . . . *acquire land; construct new schools; . . . .*" (Italics added.) Later in the paragraph was the following statement: "*Necessary site preparation/restoration may occur in connection with new construction*, renovation or remodeling, or installation or removal of relocatable classrooms, including ingress and egress, removing, replacing or installing irrigation, utility lines, trees and landscaping, relocating fire access roads, and acquiring any necessary easements, licenses, or rights of way to the property." (Italics added.)

The ballot materials also included an "Impartial Analysis of Measure 'O'" by the Riverside County Deputy County Counsel, which stated the bond funds would be used to "repair and upgrade District schools by upgrading or *replacing aging school infrastructure*," and the COC would conduct audits to ensure funds were spent only on "*the construction, reconstruction, rehabilitation, or replacement of school facilities*, including the furnishing and equipping of school facilities, or the acquisition or lease of real property for school facilities, and for no other purpose." (Italics added.)

In an election with nearly 75 percent registered voter turnout, Measure O was resoundingly approved, with 57,347 residents voting yes, and 24,064 voting no. In other words, Measure O passed with more than 70 percent of the vote.

Following the measure's passage, the Board proceeded to appoint an independent COC, which issued its first oversight report in June 2017. The report stated the long range facilities master plan that was created in 2016—and referenced in the ballot materials—would guide the scope of the projects to be pursued. At its June 29, 2017 meeting, the Board received an update on Measure O projects, at which time a speaker gave a presentation

5

on the possibility of building a school in the Eastside/Casa Blanca area of Riverside (Casa Blanca Elementary School).

In February 2019, a member of COC, Jason Hunter, wrote a letter to RUSD questioning whether the district had the legal authority to use Measure O funds to purchase property for the proposed new Casa Blanca Elementary School. The RUSD's chief business officer addressed Mr. Hunter's concern at the COC's August 21, 2019 meeting, reporting the Board had obtained two separate legal opinions finding the use of funds for the new school construction was legally valid and the Board therefore intended to proceed with the projects. The COC voted to close discussion on the topic.

As of September 14, 2023, the Board began approving bids for construction of the new Casa Blanca Elementary School.

PROCEDURAL HISTORY

On July 14, 2023, RAIT filed a verified complaint for injunctive relief and a petition for writ of mandate against RUSD and its superintendent, Renee Hill. The action was filed pursuant to section 15284, which permits taxpayers within a school district to file a school bond waste prevention action to enjoin the illegal expenditure of bond proceeds.

RAIT then filed a motion for preliminary injunction to enjoin RUSD from spending Measure O funds on the construction of four school sites: the Casa Blanca Elementary School, the Eastside and Highgrove II neighborhood schools, and the STEM education center. It argued the four schools were not specifically identified in the project list contained in Measure O.

The trial court denied the motion, finding Measure O's language contemplated and identified not only the repair and upgrade of existing schools but also the construction of new school facilities. The court also found

6

RAIT failed to show it would suffer irreparable harm if its motion were denied.

The trial court heard RAIT's petition for writ of mandate on January 12, 2024, and denied it too. Citing *Foothill-De Anza Community College Dist. v. Emerich* (2007) 158 Cal.App.4th 11 (*Foothill-De Anza*), the court found Proposition 39 requires only that the project list be specific enough to allow for meaningful approval by the voters and oversight of bond expenditures. The court concluded Measure O's language sufficiently informed voters that construction of new schools was among the projects for which the bond proceeds could be used.

## DISCUSSION

RAIT raises two issues on appeal. First, it argues RUSD is violating Proposition 39 by using Measure O funds to build the new Casa Blanca Elementary School, Eastside and Highgrove II schools, and the STEM education center because those projects were not specifically identified in the ballot measure. Second, it argues the Board did not adequately certify it had evaluated safety, class size reduction, and information technology needs when it developed the Measure O project list.[3]

## I.

### STANDARD OF REVIEW

"'In reviewing a trial court's judgment on a petition for writ of ordinary mandate, the appellate court applies the substantial evidence test to the trial court's factual findings, but exercises its independent judgment on

---

[3] RUSD's appellate brief raised the separate issue whether RAIT's lawsuit was timely under the statute of limitations or barred by the doctrine of laches. Because we (like the trial court) conclude Measure O complied with Proposition 39, it is unnecessary for us to reach these issues.

legal issues, such as the interpretation of statutes. [Citation.]' (*Abbate v. County of Santa Clara* (2001) 91 Cal.App.4th 1231, 1239.) Thus, to the extent that the trial court's decision does not turn on disputed facts, we review de novo the trial court's interpretation of the constitutional provisions at issue." (*Committee for Responsible School Expansion v. Hermosa Beach City School Dist.* (2006) 142 Cal.App.4th 1178, 1184 (*Hermosa Beach*).)

II.

MEASURE O CLEARLY NOTIFIED VOTERS NEW SCHOOL CONSTRUCTION WAS AMONG THE POTENTIAL PROJECTS TO BE FUNDED BY THE BONDS

In *Hermosa Beach*, the court explained the requirements applicable to school bond measures following the adoption of Proposition 39: "[A] school district's bond indebtedness for certain school facilities projects may be approved by only 55 percent of the voters 'if the proposition approved by the voters and resulting in the bond indebtedness includes' a set of four enumerated accountability requirements. (Cal. Const., art. [XIII A], § 1, subd. (b)(3).) Those requirements are: (1) That the proceeds from the sale of the bonds be used only for the purposes specified in that section and not for any other purpose, such as salaries or operating expenses; (2) a list of the specific school facilities to be funded and the school district's certification that it has evaluated certain factors in developing that list; (3) that the school district board conduct an annual, independent performance audit to ensure that the funds have been expended only on the specific projects listed; and (4) that school district board conduct an annual, independent financial audit of the proceeds from the sale of the bonds until all proceeds have been expended. (Cal. Const., art. [XIII A], § 1, subd. (b)(3)(A)–(D).)" (*Hermosa Beach*, *supra*, 142 Cal.App.4th at p. 1187.)

8

Here, we are concerned with the second requirement—i.e., the adequacy of the list of school facilities to be funded and the Board's certification.

The court in *Foothill-De Anza* addressed the meaning of this requirement. It stated: "The plain language of the constitutional provision added by Proposition 39 is that the bond proposal must contain, '[a] list of the specific school facilities projects to be funded and certification that the school district board . . . has evaluated safety, class size reduction, and information technology needs in developing that list.' Since this language sheds no light on how specific Proposition 39 expects the list to be, we turn to the publisher's historical note for article XIII A, section 1, which contain the purpose and intent of the Proposition 39 ballot initiative.

"The overall purpose of the initiative was 'to prepare our children for the 21st Century, to implement class size reduction, to ensure that our children learn in a secure and safe environment, and to ensure that school districts are accountable for prudent and responsible spending for school facilities . . . . ' (Note, Deering's Ann. Cal. Const. (2007 supp.) foll. art. XIII A, § 1; see art. XIII A, § 3.) . . . The type of projects the initiative was intended to encourage is revealed by its requirement that school district evaluate 'safety, class size reduction, and information technology needs' in developing the list of projects to present to the voters for approval. The accountability goal is achieved by requiring that, 'before they vote, voters will be given a list of specific projects their bond money will be used for,' and by requiring annual, independent financial and performance audits. (*Id.,* subds. (a)–(d).) In other words, the initiative was intended to make it easier to pass school bonds, the proceeds of which would be used to upgrade school facilities, reduce class size, and improve safety, and to ensure that district boards actually spent the

9

bond proceeds on the projects the voters approved. That means that the list of projects submitted to the voters must be specific enough that the voters know what it is they are voting for and the auditors know how to evaluate the district's performance. . . 'The critical factor in assessing whether the project list complied with Proposition 39 is whether it allows for meaningful approval and oversight of the bond expenditures . . . . ' Thus, if the list defines or identifies the projects in a manner that clearly apprises the voters, the auditors, and the public oversight committees of *the types of projects for which the money is intended to be used,* that is sufficient." (*Foothill-De Anza, supra*, 158 Cal.App.4th at pp. 23–24, italics added.)

We consider, therefore, whether the ballot materials for Measure O apprised the voters, auditor, and public oversight committees of "the types of projects for which the money" would be used. (*Foothill-De Anza, supra*, 158 Cal.App.4th at p. 24.) We conclude they did.

One of the expressly articulated objectives of Measure O was to raise funds to repair and upgrade Riverside schools. The measure clearly stated "*build*[*ing*] *new classrooms and facilities* to relieve overcrowding" were among the projects that might be pursued to accomplish this objective. (Italics added.) And if that were not clear enough, later text explained: "the repair and renovation of each of the existing school facilities may include, but not be limited to," *potentially* "*acquir*[*ing*] *land*" *and* "*construct*[*ing*] *new schools.*" (Italics added.)

RAIT points to dictionary definitions of "specific," "project," and "list," arguing "specific" means to be precise, explicit, or definite, and a "list" is a group of items grouped together in a meaningful way. From this, it argues a "'list of specific school facilities projects'" must be "a precise and definite recitation of planned facilities improvements grouped together in a

10

series that communicates to voters the explicit projects that the district is contemplating."

RAIT acknowledges its proposed interpretation of the requirements is more restrictive than the one adopted by the *Foothill-De Anza* court, but it attempts to distinguish that case. The plaintiffs in *Foothill-DeAnza* argued the project list was insufficient because it only set forth categories of projects and was not specific as to which facilities would receive repairs. The court found it was adequate to list the *types* of projects on which the funds would be spent. RAIT argues new school construction is not among the types of projects outlined in the Measure O ballot materials.

We disagree. Measure O specifically identified new school construction as a possible use for the bond proceeds. Indeed, it did so multiple times. The proposal presented to voters on the ballot stated bond proceeds would be used in part to "'construct, acquire, repair classrooms, sites, facilities and equipment.'" Construction of new facilities is listed as a bullet point under the basic school repair and upgrade project in the project list. And acquiring new land and constructing new schools is articulated in the paragraph of text that followed. Specifically, it is in the fourth sentence of that paragraph, which articulated a list of items "[i]n addition to the projects listed above."[4]

RAIT tries to brush aside the disclosure in the fourth sentence, suggesting it is not part of the project list because it says the projects it identifies are "[i]n addition to the listed projects stated above." Again, we

---

[4] The fourth sentence stated: "*In addition to the projects listed above,* the repair and renovation of each of the existing school facilities may include, but not be limited to, some or all of the following: . . . *acquire land; construct new schools; . . .*" (Italics added.)

disagree. RAIT's argument would have us read the fourth sentence out of the text, which is not a reasonable construction. Rather, reading the paragraph that contains the fourth sentence and the phrases "acquire land" and "construct new schools" in the context of the ballot materials as a whole leads to only one logical interpretation: Measure O advised voters that the school district might acquire land and construct new schools with bond proceeds because these two actions might be necessary to meet some of the district's objectives for raising the bond money in the first place: upgrading existing facilities and relieving overcrowding.

Our construction is further bolstered by a later sentence in the paragraph, which reads: "Necessary site preparation/restoration may occur *in connection with new construction*, renovation or remodeling, or installation or removal of relocatable classrooms, *including ingress and egress, removing, replacing, or installing irrigation, utility lines, trees and landscaping, relocating fire access roads, and acquiring any necessary easements, licenses, or rights of way to the property*." (Italics added.) The types of activities listed—such as establishing ingress/egress, installing irrigation and utility lines, and obtaining easements—are precisely the kinds of activities that would be required to prepare a vacant property for new construction.

RAIT tries to align this case with *Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013 (*San Diego USD*), in which the court found the school district's project list did not specify bond proceeds could be spent on installation of field lighting at Hoover High School's football stadium. (*Id.* at p. 1021.) The facts of that case are distinguishable.

The measure at issue in *San Diego USD* had two parts. The first part described the types of projects that could be completed at any or all

12

school sites, and the second part identified the particular projects that would be constructed at each specifically identified school site. (*San Diego USD*, *supra*, 215 Cal.App.4th at p. 1027.) Although "field lighting" was included in the first part of the project list, it was not among the particular tasks identified for Hoover High School in the second part of the list. (*Id.* at pp. 1027–1028.) Instead, the project list for Hoover High School noted it was intended to improve school accessibility and upgrade for purposes of code compliance. (*Id.* at p. 1027.) With respect to the football field, the only such projects mentioned were renovating or replacing stadium bleachers and upgrading fields for accessibility compliance. (*Ibid.*) The court found field lighting was not required for accessibility compliance and could not reasonably be considered part of the plan to renovate the stadium bleachers. (*Id.* at p. 1029.)

Thus, *San Diego USD* dealt with a completely different situation. The court could compare the projects identified in the bond measure to be undertaken at Hoover High School with the projects actually planned and determine field lighting at that location had neither been proposed in the bond measure nor approved. Here, in contrast, acquiring land and constructing new facilities and schools were expressly identified in Measure O as potential uses of the bond funds.

III.

THE FACILITIES MASTER PLAN DOES NOT LIMIT MEASURE O'S PROJECT LIST

As earlier noted, the preamble in Measure O's project list stated the Board had "evaluated the District's urgent and critical facility needs, including safety issues, class size, computer and information technology, enrollment trends and prepared" a facilities master plan to help it "develop[]

13

the scope of projects to be funded." The facilities master plan was incorporated by reference into the ballot materials in its entirety.

RAIT points out the facilities master plan does not explicitly mention new school construction; nor does it mention the four specific sites RAIT now contests: Casa Blanca Elementary School, Eastside, Highgrove II and the STEM education center. Again, RAIT's reading of the documents is too narrow.

The facilities master plan clearly states it is, among other things, "[a] roadmap forward forming guidelines for facilities decisions both on existing and future sites including schools, support centers and undeveloped parcels." It also states it is not a "'needs assessment' (the document is not an exhaustive survey of existing conditions or an outline of repair work orders)" or "[a] 'design solution' (the design of specific remedies and advancement will come later)." Therefore, it is irrelevant that new school construction is not specifically addressed in the facilities plan. So long as new school construction was disclosed in the Measure O ballot materials as one of the possible uses of the bond funds—and it clearly was—the requirement that the ballot materials identify the specific types of school facilities projects to be funded was met.

IV.

MEASURE O CONTAINED THE REQUIRED CERTIFICATION BY THE RUSD BOARD

RAIT's final argument is that Measure O lacked a "certification that the school district board . . . has evaluated safety, class size reduction, and information technology needs in developing" its project list. (See Cal. Const., art. XIII A, § 1, subd. (b)(3)(B).) RAIT argues Measure O's preamble states only that the Board "evaluated safety, class size reduction and

14

information technology needs" in connection with preparing the facilities master plan. We do not agree.

The preamble states the facilities master plan was prepared as part of the Board's evaluation of safety, class size reduction, information technology needs and enrollment trends. But this does not mean the facilities master plan is the same as the project list. Rather, the facilities master plan was used to help "develop[] the scope of projects to be funded." It was part of the Board's evaluation of the required factors and helped the Board to shape the project list. Thus, the Board's certification was not of the facilities master plan, but of the project list that appeared on the ballot.[5]

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

GOODING, J.

WE CONCUR:

DELANEY, Acting P.J.

SCOTT, J.

---

[5] Because we conclude the certification in Measure O was sufficient, we need not consider RUSD's contention that the Board resolution putting Measure O on the ballot also provided the requisite certification.

15