[Civ. No. 7481.   Third Dist.   Mar. 31, 1948.]

BOARD OF SUPERVISORS OF THE COUNTY OF MERCED et al., Petitioners, v. R. W. COTHRAN, as County Clerk, etc., Respondent.

Frank C. Hale, District Attorney, Samuel V. Cornell and William R. Elam, Deputy District Attorneys, for Petitioners.

Orrick, Dahlquist, Neff, Brown & Herrington for Respondent.

ADAMS, P. J.—By this proceeding the Board of Supervisors of the County of Merced and the Merced Union High School District seek a writ of mandate to compel respondent, who is the county clerk of Merced County, to sign certain bonds in the sum of $800,000, which bonds were voted at a special election held by the Merced Union High School District on May 16, 1947, for the purpose of securing authorization to issue the aforesaid bonds. The purposes for which said bonds were proposed to be issued, as stated in the notice of the election, was to raise money for

(a) The purchase of a school laboratory farm.

(b) The building or purchase of school buildings.

(c) The making of alterations or additions to the school building or buildings other than such as may be necessary for current maintenance, operation, or repair.

(d) The repairing, restoring, or rebuilding of any school building damaged, injured, or destroyed by fire or other public calamity.

(e) The supplying of school buildings with furniture or necessary apparatus of a permanent nature.

(f) The permanent improvement of the school grounds.

The voters at said election voted in favor of the issuance of said bonds, but respondent has refused to sign them for three

reasons: (a) that one of the purposes for which said bonds were voted, to wit, "the purchase of a school laboratory farm," does not conform to the purposes for which a school district may issue bonds as set forth in section 7401 of the Education Code, and that a school district is not authorized to incur indebtedness or to issue and sell bonds for such a purpose; (b) that two separate polling places were established for one election precinct, to wit, precinct No. 18, and that all of the votes cast in said precinct should be rejected and that upon such rejection said bond issue failed to carry by the required two-thirds of all of the votes cast at said election; (c) that different polling hours were fixed in the different precincts into which said district was divided for the purpose of said election contrary to sections 7403 and 7404 of the Education Code in that the hours during which the polls should have remained open should have been uniform through said district and in each and every precinct thereof for the purpose of said bond election.

██ The law seems to be well settled in this state that where any one of the stated purposes for which bonds are issued is an unauthorized purpose and a single aggregate sum is specified for all of the purposes, the whole must fail since it is impossible to separate the good from the bad. Our own Supreme Court has so held in *City of San Diego* v. *Potter*, 153 Cal. 288, 292 [95 P. 146], and *Streator* v. *Linscott*, 153 Cal. 285, 287 [95 P. 42]. In the latter case one of the declared purposes for which certain school district bonds were issued was "for the purpose of raising money for purchasing school lots, for building one or more school houses, or insuring the same. . . ." The court said that the act of 1893 (the statute then in force) did not authorize the issuance of bonds for the purpose of insuring schoolhouses or other property, and that therefore the bonds were void. In *Santa Ana School District* v. *Talbert*, 19 Cal.App. 104, 107 [124 P. 872], there was added to the declaration of purposes for which school bonds were voted, the words "and afford better facilities for educating the school children within said school district." The court held that said phrase did not in itself amount to a declaration of a purpose and should therefore be disregarded; but it also said that if, as contended by respondent, the bonds were issued and sold for purposes not contemplated by the statute, the invalidity of the bonds was conceded. In *Allard* v. *Board of Education*, 101 Ohio St. 469 [129 N.E. 718], the board of education submitted to the electors the question of a bond issue for three

specified purposes, one of which was the purchase of motor trucks and wagons. In an action brought to enjoin the issuance of the bonds, it was held that the purchase of motor trucks and wagons was not one of the purposes for which authorization for the issuance of bonds was given by statute, and that therefore the entire bond issue must be enjoined. In 56 Corpus Juris, page 577, section 696, it is said: "The purposes for which bonds may be issued are generally fixed by statute, and where so fixed bonds may not be issued for any other purpose, nor may bonds be issued to raise funds for matters otherwise provided for by statute, and bonds issued for an unauthorized or improper purpose are void."

The question, then, is whether "the purchase of a school laboratory farm" is a purpose for which the issuance of bonds by school districts is authorized by statute. Section 7401 of the Education Code provides and limits the purposes for which such bonds may be issued and sold, the only one pertinent here being: "(a) The purchasing of school lots."

Petitioners contend that the term "school lots" is sufficiently broad to include a "school laboratory farm." We have not been enlightened as to what is meant by a school "laboratory" farm, but we are satisfied that in the general acceptation of the word "farm" it is not analogous with the word "lot," nor do the words "school lots" connote a "school farm." A farm is generally defined as a tract of land used for raising crops or rearing animals—one devoted to agriculture, stock raising or some allied industry. (See 16 Words and Phrases (perm. ed.), pp. 248-252; 25 C.J. 670-672; 35 C.J.S. 746-747; *Hagenburger* v. *City of Los Angeles,* 51 Cal.App.2d 161, 164 [124 P.2d 345].) And the word "farming" in both the popular and legal meaning of the term is the cultivation of the soil for the production of crops therefrom; the act of cultivating the land; the business of tilling the soil.

The word "school" is variously defined as an institution or place for instruction or education; a place for learned intercourse and instruction; a place for acquiring knowledge and mental training; a place for the instruction of children; a place where instruction is imparted to the young; an educational establishment. (See 56 C.J. 167, and note 3; *State* v. *Boyd,* 217 Ind. 348 [28 N.E.2d 256, 264]; *Board of Education* v. *Ferguson,* 68 Ohio App. 514 [39 N.E.2d 196, 198].)

Traditionally the practical farming and the operation of a farm have not been a part of the curricula of our common schools, nor farms a part of their school property; nor does the

word "lot" suggest to the mind the word "farm," though it may not necessarily exclude it. But in order to justify the issuance of bonds for the acquisition of a farm by a common school district, something more than the authority to issue such bonds for the acquisition of "school lots" is essential.

Section 7401 of the Education Code, above cited, is found in chapter 17 of division 3 of that code, entitled "Bonds." The section is derived from section 1880 of the Political Code enacted in 1881 (Stats. 1881, p. 62) which provided for the issuance of bonds by a school district for the purpose of raising money for building or purchasing schoolhouses, for furnishing same, and for liquidating the indebtedness for schoolhouses already erected. It did not provide for the purchase of school lots. In 1885 (Stats. 1885, p. 8) the section was amended to remedy this defect and to provide for the issuance of bonds for the added purpose of purchasing school lots. In 1889, it was further amended to provide for the issuance of bonds for purchasing school lots, for building schoolhouses and supplying same with furniture and necessary apparatus, for improving the grounds, and for liquidating any indebtedness already incurred for such purposes. In 1893 (Stats. 1893, p. 267) it was amended by adding to the purposes the insuring of schoolhouses. It was amended again in 1895 (Stats. 1895, p. 245), 1899 (Stats. 1899, p. 94), and 1909 (Stats. 1909, p. 897) ; but in none of said amendments was any provision made for the issuance of bonds for the purpose of purchasing school farms.

In 1909, section 1745 of the Political Code was enacted as a part of article XIV, chapter 3, title 3 of part 3, said article being entitled "Establishment and Government of High Schools and High School Districts." Said section 1745 (Stats. 1909, p. 488) provided for the issuance of bonds by high school districts for "the purpose of raising money for purchasing high school lots, for building or purchasing one or more high school buildings or making alterations or additions to the high school building or buildings, for repairing, restoring or rebuilding any high school building damaged, injured or destroyed by fire or other public calamity, for insuring high school buildings, for supplying high school buildings with furniture or necessary apparatus, for improving the grounds, for liquidating any indebtedness already incurred for said purposes, or for refunding any outstanding valid indebtedness of such district, evidenced by bonds or warrants thereof." In 1913, said section was amended (Stats. 1913, p. 772) but without change as to the purposes for which high school districts

might issue bonds. Upon the adoption of the school code, section 4.960 thereof provided the purposes for which any school district might issue bonds and apparently superseded both sections 1880 and 1745 of the Political Code; and with the adoption of the Education Code said section 4.960 was superseded by section 7401, *supra*. It will be noted that in none of said enactments was any authority given to issue bonds for the purchase of school laboratory farms or school farms of any kind.

In 1945, the Legislature added chapter 12 to division 9 of the Education Code, division 9 being entitled "Environment and Equipment," and chapter 12, "School Farms" (Stats. 1945, ch. 533, § 1). Section 19621 in said chapter 12 provides: "The governing board of any district maintaining a secondary school, or schools, may, for the purpose of providing practical instruction in agriculture, establish one or more school farms for any one or more of such schools whenever in its judgment it is advisable to do so." However, it also provides that the cost of purchasing and equipping a high school farm and all other costs not met from the receipts of operation of the farm shall be a charge against the funds of the district. Section 19623 authorizes the governing board of the high school district to provide for the general supervision of the farm, the cost thereof to be a charge against the funds of the district. It also provides that the board may buy feed, livestock, etc., for the farm, and sell the products thereof. But this new enactment makes no provision for the issuance of bonds for the purpose of acquiring school farms, but, on the contrary, obviously provides that they must be paid for out of the general school funds; and no amendment of section 7401 has been enacted to extend the purposes for which bonds may be issued by school districts. Furthermore, section 7401 applies to all school districts, while section 19621 applies to high school districts only. And if, as contended by petitioners, the authority to issue bonds to purchase "school farms" is to be inferred from the authority to issue bonds to purchase "school lots," then we would have this curious situation: School districts other than high school districts could acquire farms with bond moneys, while high school districts could not; and legislative provision would exist for the acquisition of livestock, etc., for high school farms, the management of same and the disposition of the products, while no such provisions would have been made regarding other school district farms. Also, section 19621 of

the new chapter 12 would have been entirely superfluous, unless it was intended to limit the acquisition and conduct of farms by high school districts without placing similar limitations upon other districts. For those reasons we are of the opinion that petitioners' contention in this behalf cannot be sustained.

Such conclusion is fortified by such cases as *Hyatt* v. *Williams*, 148 Cal. 585 [84 P. 41], and *Von Schmidt* v. *Widber*, 105 Cal. 151 [38 P. 682]. In the former case, where bonds had been issued by the city of Stockton for the purpose of constructing and maintaining an electric lighting plant for the purpose of lighting the streets and other public places and to furnish the inhabitants with light, the question arose whether the city had the power, under its charter, to engage in the business of furnishing lights to the citizens for their private use. The charter authorized the city council to provide for lighting the streets, avenues and public places, and to provide for such lights as were necessary for the convenient transaction of public business. The decision of the court was that these powers did not include the power to maintain works and carry on the business of supplying the inhabitants with light; that the municipal corporation could only exercise the power granted by express words or by necessary or fair implication from the powers granted, or essential to the declared objects and purposes of the corporation. In *Von Schmidt* v. *Widber*, it was also stated, quoting from 11 Dillon on Municipal Corporations, 4th edition, section 89, that a municipal corporation can exercise only those powers granted in express words, or those necessarily or fairly implied in or incident to the powers expressly granted, or those essential to the declared objects and purposes of the corporation *"not simply convenient, but indispensable."* Also that any fair reasonable doubt concerning the existence of power is to be resolved by the courts against the corporation, and the power denied.

The power to issue bonds to acquire a farm is not granted by express words contained in section 7401, *supra,* or elsewhere, nor can it be said that such power is necessarily or fairly implied in or incident to the powers expressly granted, or essential to the purposes of a school district. And any doubt should be resolved against such power.

Petitioners contend that the unauthorized purpose for which the bonds were voted was cured by the validating act of 1947 (Stats. 1947, ch. 1335). But the purpose being

unauthorized, the validating act cannot be said to have been intended to confer authority denied by the existing statute. In *People* v. *Van Nuys Lighting District*, 173 Cal. 792, 797 [162 P. 97, Ann.Cas. 1918D 255], where a curative act was relied upon the court said: "A curative act or a conclusive evidence clause in a statute is effective to cure all defects resulting from a failure to comply with provisions which are merely directory of the mode of the exercise of the power. But defects and omissions which go to the jurisdiction of the board to act at all, and which make their action absolutely void, cannot be cured in this manner. (*Ramish* v. *Hartwell*, 126 Cal. 443, [58 P. 920]; *Chase* v. *Trout*, 146 Cal. 350, 359 [80 P. 81]; *Kelly* v. *Luning*, 76 Cal. 309, [18 P. 335]; *People* v. *Lynch*, 51 Cal. 15, 19, [21 Am. Rep. 677]; *Brady* v. *King*, 53 Cal. 44; *People* v. *Goldtree*, 44 Cal. 323.)" Also see 23 California Jurisprudence, page 611, where it is said that a curative act is one designed to give effect to past acts which are ineffective because of failure to comply with some requirement of law, by correcting errors of mere mode, and supplying omissions the necessity of which might have been dispensed with by the prior statute. Also see *City of Pacific Grove* v. *Irwin*, 76 Cal.App.2d 46 [172 P.2d 357], and *City of Venice* v. *Lawrence*, 24 Cal.App. 350 [141 P. 406], illustrative of the rule that validating acts may cure errors or irregularities of procedure, where none of the steps omitted to be taken was jurisdictional. To a similar effect is the rule in Illinois as set forth in *People ex rel. Reeves* v. *Bell*, 309 Ill. 387 [141 N.E. 187, 188].

The validating act of 1947 specifically provides that it shall be limited to the correction of defects, irregularities, omissions and ministerial errors in complying with statutory requirements, and we are satisfied that it did not have the effect of rendering valid bonds issued for an unauthorized purpose which rendered the issue void.

As for the objections raised by respondent that there was error on the part of the board in establishing two voting places in one precinct, and in providing for different voting hours in the various precincts, since we are satisfied that the bond issue was invalid for the reasons previously stated, it becomes unnecessary to determine them.

It is ordered that the writ prayed for be denied.

Peek, J., and Thompson, J., concurred.