EDMUND G. BROWN JR. Attorney General CONSTANCE L. LeLOUIS Supervising Deputy Attorney General DANIEL G. STONE Deputy Attorney General
THE HONORABLE S. JOSEPH SIMITIAN, MEMBER OF THE STATE SENATE, has requested an opinion on the following questions:
1. When a school district has outstanding voter-approved general obligation bonds, may the district issue refunding general obligation bonds without further voter approval at a price or an interest rate that will generate proceeds in excess of the amount needed to retire the outstanding bonds?
2. May a school district that has issued refunding general obligation bonds without a vote of the electorate spend proceeds from that bond sale to supplement funding for the original voter-authorized projects; to fund additional capital projects; or for other purposes unrelated to paying off the outstanding bonded indebtedness? *Page 2 
3. May a school district issue refunding general obligation bonds to refund previously issued bonds without obtaining voter approval if doing so will result in: (a) an increase in the district's ad valorem property tax rates; or (b) a maintaining of the district's ad valorem property tax rates at their previous levels when a reduced rate would suffice to refund the original voter-approved bonds?
4. If a school district applies the proceeds from the sale of refunding general obligation bonds to purposes not authorized by law, what are the possible consequences to the district?
5. May a school district, acting without voter approval, sell refunding general obligation bonds to a joint powers authority at par value but with an above-market interest rate in exchange for the joint powers authority's agreement to issue its own revenue bonds and to use the resulting proceeds both to purchase the school district's refunding bonds and to fund the construction of additional school facilities?
 CONCLUSIONS
1. Absent specific approval from the district's electors, a school district may not issue refunding general obligation bonds at a price or an interest rate that will generate proceeds in excess of the amount needed to retire the designated outstanding bonds.
2. Without voter approval, a district may not use proceeds from a refunding general obligation bond to provide supplemental funding for unfinished projects, even if the projects were previously approved by the electorate, or for any other purpose except to pay off the designated outstanding bonds.
3. Because a school district lacking voter approval may not issue refunding general obligation bonds to generate more proceeds than are necessary to refinance the district's targeted debt, the district is likewise prohibited from setting or maintaining ad valorem property tax rates at a level higher than necessary to refinance that targeted debt.
4. A school district's application of proceeds from the sale of refunding general obligation bonds to purposes not authorized by law may result in litigation to invalidate the bond issue or to restrain unauthorized expenditures, if timely filed; taxpayer lawsuits; or actions by the Attorney General.
5. Because the proposed arrangement between a school district and a joint powers authority would result in a refunding bond issuance in excess of that needed to merely refund the district's designated outstanding bonded indebtedness, both the refunding bond issuance *Page 3 
and the higher tax required to support it are constitutionally impermissible without specific voter approval.
 ANALYSIS
The most common means by which California school districts finance new school construction is the issuance of "general obligation bonds."[1]
These serve much the same function as home loans obtained by homeowners to finance the purchase, construction, or improvement of their homes. Bond buyers supply the issuing school district with immediate funds to apply to construction projects, and the district then repays the bonds over time, with interest, "by an annual levy of an ad valorem tax on real (and certain personal) property located within the area of the district."[2] Ad valorem taxes are based on the appraised value of the property.[3]
School district bonds are subject to a number of constitutional and statutory conditions and restrictions, the foremost of which is the constitutional requirement of voter approval. Traditionally, school construction bonds have required approval by two-thirds of the district's voters.[4] Under a 2000 amendment to the state constitution, however, approval by 55 percent of the voters suffices if specified conditions are met.[5]
The questions presented here pertain to a school district's issuing, without voter approval, "refunding general obligation bonds" (also referred to here as refunding bonds) *Page 4 
which, generally speaking, refinance designated existing general obligation bonds by either immediately retiring those outstanding bonds or, if the terms of the bonds do not permit immediate retirement, by setting up an escrow account to retire them when appropriate.[6] More specifically, the questions require us to explore what we view as a distinctly different process, often referred to as "cash-out refunding" or "refunding plus," by which a district — again, without voter approval — not only obtains proceeds sufficient to retire existing valid outstanding bonds, but generates additional proceeds, or premium, for other purposes. Before addressing the specific questions posed, we provide an overview of the context in which refunding bonds arise, beginning with issuance of the district's original, or "new money," bonds.
"New-Money" Construction Bonds
It is well established that school districts have broad authority to conduct their affairs as they see fit.[7] But a school district's power is not unlimited. "[W]hile the powers of a school district are broad, they may not be exercised in a manner that is in conflict [with], inconsistent [with], or preempted by state law."[8] For example, a school district's discretion with respect to a certain activity may be superseded by a comprehensive statutory plan governing that activity.[9]
School districts seeking to fund new construction are ordinarily subject to constraints found in two provisions of the California Constitution. Article XVI, section 18, requires either two-thirds or 55-percent voter approval before a school district may issue general obligation bonds.[10] Under this provision, commonly known as the state's "constitutional debt *Page 5 
limit" for local government, [11] a school district wishing to issue bonds must either obtain the requisite voter approval or qualify under some recognized exception to the debt-limit restriction.[12] The purpose of the constitutional debt limit is to make local agencies' long-term expenditures subject to taxpayers' oversight and approval.[13]
At the same time, article XIII A, section 1, functions as a tax cap, setting a one-percent ceiling on the ad valorem property tax rate that a local district may levy, with some exceptions. One exception, found in subdivisions (b)(2) and (b)(3) of article XIII A, section 1, authorizes the levying of additional ad valorem taxes on real property to pay the principal and interest on those voter-approved bonds satisfying the conditions of article XVI, section 18.
Thus, article XIII A, section 1, and article XVI, section 18, work in tandem. A school district may not levy ad valorem property taxes in excess of one percent except to support debt that existed prior to July 1, 1978[14] or debt resulting from voter-approved bonds *Page 6 
satisfying article XVI, section 18.[15] Accordingly, the school district needs voter approval for both pieces of the construction-bond process — i.e., both to issue the bonds and to levy the tax to repay them.
Proposition 39, adopted in the 2000 statewide general election, lowered the voter-approval threshold to 55 percent for school districts, community college districts, and county offices of education when certain conditions are met.[16] This change was intended to make it easier to pass school bonds.[17] Under Proposition 39, once a school district obtains 55 percent voter approval and satisfies all other applicable conditions, it may incur "bonded indebtedness . . . for the construction, reconstruction, rehabilitation, or replacement of school facilities, including the furnishing and equipping of school facilities, or the acquisition or lease of real property for school facilities. . . ."[18] Proceeds from the sale of such bonds may not be used for any other purpose, including salaries or other operating expenses.[19]
In addition to these constitutional limitations, a school district must comply with applicable statutory conditions governing issuance of general obligation bonds.[20] The primary statutes controlling these matters are found in Education Code sections 15000 through 15425. These provisions contain detailed requirements relating to the bonds themselves and to the elections by which voter approval is to be sought.[21]
Voters authorize *Page 7 
a maximum principal amount for bonds, [22] approve the purposes for which bond proceeds may be spent, [23] and ratify the projects to which bond proceeds may be applied.[24] Voter materials must specify a maximum interest rate and a maximum duration for each bond.[25] These parameters have been likened to terms of a contract between the district and the voters.[26]
Bonds may be sold by negotiated sale or by competitive bidding.[27]
This means that a district may either negotiate a purchase price with a purchaser or underwriter, or put the bonds out to public bid. In either event, however, the sales are subject to statutory and other legal protections intended to ensure that bond sales are made on the best terms available to the district and its voters.[28]
Refunding Bonds and "Cash-Out" Refunding
Interest rates in the bond market fluctuate over time, often declining significantly. Consequently, many currently outstanding bonds may have issued at a time when interest rates were substantially higher than current rates. When those bonds permit early redemption, some school districts consider issuing another set of bonds to refinance the earlier bonds at a lower interest rate — much as a homeowner might refinance a mortgage to obtain more favorable terms when interest rates have dropped. Such bonds issued for the *Page 8 
purpose of refinancing a district's outstanding bonded indebtedness are called refunding bonds.[29]
The refunding process may also be seen as an opportunity for a school district to generate supplemental funds, in the form of a premium. This can occur if, for example, the district issues the refunding bonds at an interest rate which, while still below the rate of the original bonds, is pegged above the current market rate. Purchasers of such above-market-rate bonds are willing to pay more than the face amount for these refunding bonds at the outset — a difference referred to as the premium — because, for the life of the refunding bonds, the district will pay the purchasers a higher interest rate than would be paid on the purchase of contemporaneously issued bonds sold at their face amount. Refunding bonds issued for the dual purpose of providing new funding as well as refinancing a district's outstanding bonded indebtedness are sometimes called "cash-out refunding bonds."
It is our opinion that some, but not all, kinds of refunding bonds may be constitutionally issued without voter approval. In general, we believe that refunding bonds issued only for the purpose of refunding valid existing general obligation bonds do not create new indebtedness within the meaning of the constitutional debt limit and do not, therefore, require voter approval, and we believe that a court, if presented with this question, would agree. This view is consistent with the Legislature's apparent understanding and intent in enacting various statutes that authorize local agencies to issue refunding bonds without voter approval so long as the proceeds are used only for purposes of refunding the original bonds.[30] This view is also consistent with case law in other jurisdictions having similar constitutional or statutory voter-approval requirements for new bonded indebtedness.[31] *Page 9 
But we see a clear distinction between (1) bonds that are issued solely for the purpose of refunding original debt, and (2) bonds that are issued to raise funds in excess of the amount needed to pay off the old debt — what we are calling cash-out refunding bonds.[32] Bonds of this latter kind, we believe, categorically result in the creation of new indebtedness for purposes of the constitutional debt limit, and therefore require new voter approvals before they may be issued. The analogy is simple and straightforward: When a homeowner refinances a mortgage both to refinance the existing debt and to take out additional equity (cash) to make home improvements, the homeowner is plainly incurring additional debt beyond that required merely to refinance the existing debt. The same must be said of a cash-out refunding situation, in which the district unquestionably incurs new debt to support the excess amount of proceeds it derives beyond what is needed to refinance the existing bonds. However, as we have explained above, California's constitution requires voter approval before a district may lawfully incur any new general obligation bond debt. Furthermore, because article XIII A, section 1, subsections (b)(2) and (3), prohibit the levying of taxes except to support voter-approved debt, the district would lack authority to levy taxes to support this additional debt without further voter approval.
To summarize, it is our opinion that pure refunding bonds — that is, bonds issued solely for the purpose of refunding existing debt — do not require additional voter approval under the constitutional debt limit, but that refunding bonds designed to generate additional proceeds for a purpose other than refunding the district's existing debt are subject to voter approval as a precondition to their issuance.[33]
Conclusion to Question 1: Absent specific approval from the district'selectors, a school district may not issue refunding general obligationbonds at a price or an interest rate that *Page 10 will generate proceeds in excess of the amount needed to retire thedesignated outstanding bonds.
We are informed that some school districts, without voter approval, currently issue cash-out refunding bonds as a means not only to retire outstanding bonds, but also to raise additional funding that may be applied, for example, to uncompleted voter-approved capital projects. Rather than conducting new elections and obtaining voter approval for such cash-out refunding bonds, as provided by statute, [34] these school districts simply issue the bonds upon a resolution of their governing bodies — a process described in other statutory provisions.[35]
They argue that such unilateral action is permitted under a purported exception to the constitutional debt limit established by judicial precedent. The debt-limit provision itself, article XVI, section 18, contains no mention of such an exception.
The case most often cited as establishing the exception is City of LosAngeles v. Teed, decided by the Supreme Court of California in 1896.[36]
There, the Court made the following observation: "A bond is not an indebtedness or liability — it is only the evidence or representative of an indebtedness; and a mere change in the form of the evidence of indebtedness is not the creation of a new indebtedness within the meaning of the constitution."[37] Despite the seemingly broad sweep of the Court's language, we do not believe that Teed supports the conduct in question here.
In Teed, a city council had enacted an ordinance authorizing the issuance of bonds to raise money for the limited purpose of refunding existing bonds, some of which were soon coming due.[38] A city election was conducted, in which a large majority of the voters — "much more than two-thirds of the qualified electors" — approved the proposed refunding bonds.[39] The bonds were never issued, however, because the president of the city *Page 11 
council believed that the election was invalid due to inadequate notice to voters beforehand.[40] The city then sued the president of the city council in the Supreme Court to compel him to sign the bonds, and the president demurred.[41]
The Court sustained Teed's demurrer to the city's petition, and the city's bonds were held to be unconstitutional, as was the ordinance under which they were issued. But that decision did not turn on whether a refunding bond constitutes new debt requiring voter approval. Rather, the Supreme Court sustained Teed's demurrer on the sole basis that the bonds and the underlying city ordinance unconstitutionally provided for payment in New York.[42]
Because Teed's constitutional objection was resolved on grounds unrelated to the Court's characterization of refunding bonds as a "mere change in the form of the evidence of indebtedness,"[43] that statement must be viewed as mere dictum having no precedential value. There is also a second, independent reason why the Teed Court's comments about possible avoidance of voter approval must be read as mere dictum: namely, that the refunding bonds in Teed received more than sufficient prior voter authorization. The Court found that the city had conducted a valid election for the refunding bonds in question in Teed (rejecting a claim of insufficient notice), and that the resulting voter approval had easily satisfied the constitutional debt limit provision then in effect.[44]
Although Teed has been cited in some secondary sources, and by some courts in other states, for the proposition that an agency refunding an existing debt incurs no new indebtedness within the meaning of the constitutional prohibition, [45] no reported California decision has ever relied on Teed to *Page 12 
exempt refunding bonds from the Constitution's voter-approval requirement. And, for the reasons stated above, we believe that this interpretation of Teed is overstated. Furthermore, as the court of appeal observed in All Persons Interested, [46] the Teed Court's characterization of refunding bonds as not creating a new indebtedness was restricted to the refunding of "debt that already existed in the form of bonds issued before enactment of the constitutional debt limit" — that is, debt incurred prior to January 1, 1880.[47] Obviously, no such pre-debt-limit bonds are involved in the questions posed here.
In any case, Teed's rationale, even if read broadly, could not reasonably be extended beyond refunding bonds that generate only enough proceeds to retire the old.[48] The Court did not consider refunding schemes in which a city would acquire any supplemental proceeds or premiums, but specifically limited its discussion to bonds which "merely . . . fund or refund an existing debt."[49] We therefore conclude that any "Teed exception" would have no application whatsoever to cash-out refunding bonds, which have as a chief purpose the generation of proceedsin excess of the amount required to retire targeted bonded indebtedness. As we explained in the introduction, we see a clear distinction between bonds that merely refinance existing debt and cash-out refunding bonds.
Accordingly, to the extent that a district's proposed refunding bonds would generate proceeds beyond the amount needed to refund its outstanding bonds, we believe that the refunding bonds would constitute a new bonded indebtedness within the meaning of article XVI, section 18, and would therefore require specific voter approval. Likewise, article XIII A, section 1, would prohibit the levying of taxes to support such new debt without voter approval. *Page 13 
We acknowledge that some cash-out scenarios may not necessarily increase the principal amount owed by the district beyond that of the existing debt. However, this is a distinction without a constitutional difference. In such cash-out scenarios, the excess proceeds beyond those needed to merely refinance existing debt would result from an artificial increase in the refunding bonds' interest rate. And the constitution's prohibitions apply to "bonded indebtedness" — a term that includesboth the principal and the interest associated with a bond sale.[50]
Hence, the district's debt would nonetheless exceed what is necessary to retire the original obligation, thereby triggering the voter-approval requirement.
Similarly, it is irrelevant that the cash-out refunding bond may be issued without increasing the debt service that would have supported the original debt; the fact remains that the cash-out process would generate new debt, beyond that needed to merely refund the existing debt. As we understand the debt limit, it is this latter measure that is the standard — the constitutional ceiling — for a district's permissible refunding without voter approval. And it is self-evident that, as a result of the artificially increased interest rate, a district issuing a cash-out refunding bond would need to maintain ad valorem taxes at a level higher than necessary to retire the original debt. This means that the district would be depriving its taxpayers of the full benefits of refinancing; instead, the taxpayers would be taxed, without voter approval, to support this new debt — a result that is not permitted under either the constitutional debt limit or the constitutional cap on taxes.
Some districts may argue that their cash-out refunding practices are authorized by statute, and we are aware of several statutory provisions which expressly authorize local agencies to issue refunding bonds without voter approval under certain circumstances.[51] *Page 14 
However, in light of the constitutional constraints discussed above, we do not believe that the relevant statutory schemes governing school district bond issuances may reasonably be read to authorize issuance ofcash-out refunding bonds without voter approval. Manifestly, the Legislature cannot override constitutional limitations by statute, [52]
and we are constrained to interpret statutes authorizing the issuance of refunding bonds in a manner that is consistent with the state constitution.[53] Statutory authority may not be read to "clash with the constitutional provision which required popular approval of the bonds in the first place, or, as in this case, the constitutional authority for the bond issue."[54] In our view, each of these cited statutory provisions must be interpreted as requiring voter approval whenever the proceeds of refunding bonds, or their associated supporting taxes, exceed the amounts required to retire the district's existing debt.
Additionally, some districts argue that cash-out refunding bonds satisfy the constitution's voter-approval requirement as long as the particular projects to which the cash-out funds are applied were among funding targets previously identified and "approved" in conjunction with voter endorsement of a prior general obligation bond. We reject this theory, however, because it both misses and defies the central point and purpose of the debt limit: namely, to require voter approval whenever new"indebtedness" is incurred.[55] Thus, in our view, any approval by voters of prior bond proposals would authorize only the amounts associated with those earlier bonds, regardless of the number or size of the construction projects that were identified on the earlier ballot as possible objectives for that funding. We think it unreasonable to construe a positive vote on those previously requested bond amounts as constituting an open-ended voter endorsement of future funding schemes *Page 15 
and of subsequent indebtedness not then proposed. If the proceeds from issuance of those prior bonds prove insufficient to complete some or all of the previously listed projects — because the district's cost estimates were too low, for example, or its project lists too ambitious — then, under the debt limit's requirements, it is incumbent upon the district to obtain new voter approval for new bonds if it wishes to further advance the projects.
We conclude that, absent express approval by the voters, a school district may not issue refunding general obligation bonds at a price or interest rate that will generate proceeds in excess of the amount needed to refund the targeted outstanding bonds.
Conclusion to Question 2: Without voter approval, a district may notuse proceeds from a refunding general obligation bond to providesupplemental funding for unfinished projects, even if the projects werepreviously approved by the electorate, or for any other purpose exceptto pay off the designated outstanding bonds.
The second question is partially answered by our conclusion to Question 1: Refunding bonds may not be issued without voter approval if the proceeds (including premium) would exceed the amounts required for refunding purposes. However, the second question also encompasses the circumstance wherein a district issues general obligation refunding bonds with premium and without voter approval, but where the total amount of the proceeds, including premium, does not exceed the amount needed to pay off the outstanding indebtedness. In such a circumstance, are there any restrictions on the district's deposit, use, or other disposition of the proceeds? We conclude that the use of proceeds derived from such refunding bond sales, including premium, is restricted to paying off the district's outstanding bonded indebtedness.
There is both a constitutional and a statutory dimension to our analysis of this question. The constitutional answer is a corollary to the conclusion we reached in analyzing Question 1. That is to say, given that the only constitutionally permissible purpose for refunding general obligation bonds issued without voter approval is to merely refund the district's outstanding bonds, and given that the amount of proceeds that may be derived from such refunding bonds is limited to the bare amount required to refinance and retire that outstanding bonded indebtedness, it follows that the debt limit prohibits application of those proceeds to any project or purpose except paying off the district's outstanding bonds. Were it otherwise, the net effect to the voters would be the addition of new, non-refunding debt, evidenced by the proceeds of the ostensible refunding issuance that were diverted to other purposes. Accordingly, as a constitutional matter, we conclude that a district is prohibited from using the proceeds of even a non-cash-out refunding issuance to supplement funding for ongoing construction projects, to fund new projects, or for any purpose other than refunding the district's targeted indebtedness. *Page 16 
As for the statutory dimension of the question, we are informed that most districts issuing cash-out refunding bonds claim to be doing so under the authority of Article 9.[56] As a threshold matter, it is an open question whether premiums are permitted under California law if the statutes authorizing the bonds are silent on that point, as Article 9 is. We know of no case addressing whether bond issuers may manipulate sale terms to obtain a premium without express statutory authorization. However, our state Supreme Court has determined that bonds may be issued at a discount if the statute is silent on that question, provided that the bonds are sold on the most favorable market terms available to the agency and thus protect the interests of the taxpayers.[57] By analogy, therefore, we believe that a court would, or reasonably could, deem it permissible to sell refunding bonds at prices above par so long as the taxpayers' interests are protected.[58] And, as we earlier observed, Article 9's authorization for issuance of refunding bonds without voter approval[59] cannot be read consistently with the constitution to encompass cash-out refunding bonds.[60]
Assuming that a premium is permitted with Article 9-refunding bonds, even in the non-cash-out circumstance contemplated, i.e., where total proceeds (including premium) would not exceed the amounts required to pay off the existing bonded indebtedness, Article 9 would clearly limit the use of the refunding bond proceeds when the issuance does not have voter approval. First, Article 9's authority is itself expressly restricted to bonds issued "for the purpose of refunding any of the indebtedness of the local agency evidenced by bonds."[61] And second, Government Code section 53555, within Article 9, specifically *Page 17 
requires that all proceeds received from the sale of refunding bonds be deposited in the local agency's treasury "for the purpose of refunding the bonds to be refunded."
Some districts might assert that a premium is distinct from the "proceeds" of a bond, and that, therefore, a premium escapes the reach of the debt limit and of section 53555. But we disagree. In our view, any premium generated by the sale of a refunding bond is simply one component of the total proceeds of the bond;[62] hence section 53555's clear limitation on districts' use of proceeds applies to any premium.
We are aware that section 29303, if it governed in these circumstances, would apply premium to different purposes than the remaining proceeds.[63] But, by its terms, section 29303 has no application if "it is expressly provided by law that [premiums] be deposited in some other fund." In our view, section 53555, which expressly provides that Article 9 refunding-bond proceeds may be usedonly to pay off districts' targeted outstanding indebtedness, takes those proceeds, including any premium, outside the scope of *Page 18 
section 29303.[64]
Thus, even where a district's refunding-bond issuance contains no cash-out premium and generates only enough proceeds to retire outstanding bonds, the district's use of those proceeds is strictly limited. California law permits only one application of proceeds — including any premium — from a district's general obligation refunding bonds issued without voter approval, and that is to retire the district's targeted existing outstanding bonded indebtedness.[65]
Conclusion to Question 3: Because a school district lacking voterapproval may not issue refunding general obligation bonds to generatemore proceeds than are necessary to refinance the district's targeteddebt, the district is likewise prohibited from setting or maintaining advalorem property tax rates at a level higher than necessary to refinancethat targeted debt.
In Question 3, we are asked whether a district may issue refunding general obligation bonds that result in either an increase in the district's ad valorem property tax rate or maintenance of property taxes at a rate higher than would otherwise be necessary to refund the original voter-approved bonds. Again, we conclude that a district may not do so, unless the district's voters have given their consent to such refunding bonds as required under article XVI, section 18, of the California Constitution.
Article XIII A, section 1, imposes a one-percent property tax cap on local agencies, with the exception that ad valorem taxes may be levied to pay principal and interest on voter-approved bonds permitted under article XVI, section 18. Thus, the constitution prohibits increases or continuations of taxes, without voter approval, at a rate higher than necessary to refund the original voter-approved bonds, and therefore would forbid the imposition or maintaining of an ad valorem tax to support cash-out refunding bonds as proposed.[66] *Page 19 
Conclusion to Question 4: A school district's application of proceedsfrom the sale of refunding general obligation bonds to purposes notauthorized by law may result in litigation to invalidate the bond issueor to restrain unauthorized expenditures, if timely filed; taxpayerlawsuits; or actions by the Attorney General.
Question 4 asks about consequences that could befall a school district if it applied proceeds from a refunding general obligation bond to purposes not authorized by law. We conclude that the most significant potential penalty for such a misuse of bond proceeds would be invalidation of the bond issue. Bonds issued without authority may be invalidated,[67] as may school district bonds issued for an unauthorized purpose,[68] as well as bonds failing to satisfy the constitutional debt limit or to qualify as an exception thereto.[69]
In Education Code section 15110, the Legislature has provided a vehicle for challenging the validity of bonds:
 An action to determine the validity of bonds and of the ordering of the improvement or acquisition may be brought pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure. In such action, all findings, conclusions and determinations of the legislative body which conducted the proceedings shall be conclusive in the absence of actual fraud.[70]
One remedy available in such an action, if the court determines that a school district has issued refunding bonds for unauthorized purposes, is invalidation of the bond issues.[71]
However, interested persons must act promptly to make use of this remedy. It is available only if the challenge is filed within 60 days after the bonds were authorized to be issued.[72] *Page 20 
 [A]n agency may indirectly but effectively "validate" its action by doing nothing to validate it; unless an "interested person" brings an action of his own under [Code Civ. Proc.] section 863 within the 60-day period, the agency's action will become immune from attack whether it is legally valid or not.[73]
Additionally, if a district exceeds the authority granted by the voters, the Legislature has provided a separate remedy in Education Code section 15284.[74] Specifically, section 15284 provides that a School Bond Waste Prevention Action may be brought to restrain or prevent certain unauthorized expenditures. However, this remedy may also be available only if the action is filed within 60 days after the bonds were authorized.[75]
Apart from invalidation of the bond issue, other remedies may be available pursuant to a taxpayer's suit under Code of Civil Procedure section 526a[76] or actions by the Attorney General.[77]
Conclusion to Question 5: Because the proposed arrangement between aschool district and a joint powers authority would result in a refundingbond issuance in excess of that needed to merely refund the district'sdesignated outstanding bonded indebtedness, both the refunding bondissuance and the higher tax required to support it are constitutionallyimpermissible without specific voter approval. *Page 21 
The final question concerns a school district's hypothetical arrangement with a joint powers authority (JPA), through which a district would sell its refunding bonds to the JPA at par value but at an above-market interest rate, in exchange for which the JPA would issue its own revenue bonds and devote some of the proceeds to school construction projects in the district. In this way, the district's refunding bonds would result in supplemental funds to be applied to capital projects, but the funds would be generated and delivered in a more circuitous fashion.[78] In this scenario, the district would take advantage of declining interest rates over a period of time to, in effect, fund the construction of new school facilities pursuant to an agreement negotiated with a JPA under the Joint Exercise of Powers Act.[79]
On its face, the proposed transaction might appear to be legitimate.[80] The Joint Exercise of Powers Act authorizes two or more public entities to enter into an agreement to exercise jointly any power common to them, [81] and this agreement may provide "for the creation of an agency or entity that is separate from the parties to the agreement."[82]
Some *Page 22 
of the Act's provisions[83] were enacted expressly "to assist local agencies in financing public capital improvements."[84] The Act specifically authorizes the JPA created by a joint powers agreement to purchase bonds issued by public agencies.[85]
Although the district would appear to have statutory power to enter into such an arrangement as a general proposition, collateral consequences of the arrangement would necessarily render it unconstitutional. This arrangement violates the constitutional debt limit because it results in a refunding bond issuance in excess of what is required merely to refund the district's outstanding bonds (the excess being represented not by cash this time, but by a bargained-for set of capital improvements to be delivered by the JPA). Qualitatively, the JPA scheme is the same as a cash-out with premium in which the excess cash received at closing (acquired in exchange for above-market interest rates) would be expended by the district on capital projects. Here, although the bonds are nominally sold to the JPA "without premium," the district will repay them at an above-market interest rate — a rate selected to obtain the JPA's promised financing for other projects. We have already explained, in our response to Question 1, that, absent voter approval, the constitution's debt limit permits only those refunding bonds that are limited to refinancing existing debt.
Further, the artificially increased interest rate on the district's refunding bonds would result in higher property taxes than would otherwise be necessary to retire the district's original bonds. Hence, the arrangement would also violate article XIII A, section 1, of the California Constitution. As we explained in our response to Question 3, a school district may not issue refunding general obligation bonds without voter approval if to do so would result in an increase in advalorem property tax rates to, or a perpetuation of those rates at, a level higher than would otherwise be necessary to retire the original voter-approved bonds. Hence, the proposed arrangement between a district and a JPA would be barred by these constitutional provisions.
[1] San Lorenzo Valley Community Advocates for Responsible Educ. v.San Lorenzo Valley Unified Sch. Dist., 139 Cal. App. 4th 1356, 1395
(2006) (citing 62 Ops.Cal.Atty.Gen. 209, 210 (1979)).
Black's Law Dictionary 191 (8th ed. 2004), defines "general obligation bond" as a "municipal bond payable from general revenue rather than from a special fund. . . . Such a bond has no collateral to back it other than the issuer's taxing power."
[2] San Lorenzo Valley Community Advocates, 139 Cal. App. 4th at 1395.
[3] See Black's Law Dictionary 1496 ("Tax. Ad valorem tax").
[4] Cal. Const. art. XIII A, § 1(b)(2); art. XVI, § 18(a).
[5] Cal. Const. art. XIII A, § 1(b)(3); art. XVI, § 18(b); seeCommittee for Responsible Sch. Expansion, 142 Cal. App. 4th 1178,1184-1185 (2006); 87 Ops.Cal.Atty.Gen. 157, 157-159 (2004).
[6] See Govt. Code §§ 53551, 53555, 53558, 53580(c).
[7] See Cal. Const., art. IX, § 14; Educ. Code §§ 35160, 35160.1.
[8] Educ. Code § 35160; see Hartzell v. Connell, 35 Cal. 3d 899, 915
(1984).
[9] See Cumero v. Pub. Empl. Rel. Bd., 49 Cal. 3d 575, 591 (1989) (detailed Education Code provisions governing employment matters supersede district control over many terms of teachers' employment).
[10] Article XVI, section 18(a) provides, in pertinent part:
 No . . . school district . . . shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters . . .; nor unless before or at the time of incurring such indebtedness provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and to provide for a sinking fund for the payment of the principal thereof, on or before maturity, which shall not exceed forty years from the time of contracting the indebtedness.
Section 18(b) then provides in pertinent part that, for school districts,
 . . . any proposition for the incurrence of indebtedness in the form of general obligation bonds for the construction, reconstruction, rehabilitation, or replacement of school facilities, including the furnishing and equipping of school facilities, or the acquisition or lease of real property for school facilities, shall be adopted upon the approval of 55 percent of the voters . . . if the proposition meets all of the accountability requirements of paragraph (3) of subdivision (b) of Section 1 of Article XIII A.
[11] State ex rel. Pen. Oblig. Bond Comm. v. All Persons Interested inMatter of Validity of Cal. Pen. Oblig. Bonds to Be Issued, 152 Cal. App. 4th 1386, 1398 (2007) (hereafter "All Persons Interested").
[12] See, e.g., City of Long Beach v. Lisenby, 180 Cal. 52 (1919) (voter approval not required where bond pays debt imposed by adverse court judgment).
[13] In re Co. of Orange, 31 F. Supp. 2d 768, 776-777 (1998).
[14] Cal. Const. art XIII A, § 1(b)(1).
[15] Cal. Const. art. XIII A, §§ 1(b)(2) and (3).
[16] Prop. 39, § 4, Gen. Elec. (Nov. 7, 2000); Cal. Const. art. XVI, § 18(b). See Cal. Const. art. XIII A, § 1(b)(3); Foothill-De AnzaCommunity College Dist. v. Emerich, 158 Cal. App. 4th 11, 23
(2007).
[17] Foothill-De Anza, 158 Cal. App. 4th at 23.
[18] Cal. Const. art. XIII A, § 1(b)(3).
[19] Cal. Const. art. XIII A, § 1(b)(3)(A). See also San LorenzoValley Community Advocates, 139 Cal. App. 4th at 1403 (costs of bond issuance, as itemized in Educ. Code § 15145(a), may be paid from bond proceeds); 87 Ops.Cal.Atty.Gen.157, 161-163 (2004) (employee salaries may be paid from bond proceeds only to extent that employees perform work on approved bond projects).
[20] Sutro v. Petit, 74 Cal. 332, 336-337 (1887).
[21] See 66 Ops.Cal.Atty.Gen. 321, 323-324 (1983).
[22] Educ. Code § 15122.
[23] Id.
[24] Cal. Const. art. XIII A, § 1(b)(3)(B); Educ. Code § 15122; Comm.for Responsible Sch. Expansion, 142 Cal. App. 4th at 1185-1191.
[25] Educ. Code §§ 15122, 15140(a), 15143, 15144.
[26] See, e.g., Comm. for Responsible Sch. Expansion, 142 Cal. App. 4th at 1191 (courts have "alternately described the relationship between the public entity and the electorate arising out of a bond election as either strictly contractual or analogous to a contract"); Metro. Water Dist. v.Dorff, 138 Cal. App. 3d 388, 398 (1982) (citing Peery v. City of LosAngeles, 187 Cal. 753, 769 (1922)).
[27] Educ. Code § 15146(a).
[28] Educ. Code § 15146; see, e.g., Golden Gate Bridge v. Filmer,217 Cal. 754, 760-761 (1933) (public officials issuing bonds on behalf of local agency are presumed to act in good faith and to sell bonds on best terms obtainable).
[29] For purposes of this analysis, we assume that the duration of refunding bonds would not exceed the maximum period permitted by law. Cal. Const. art XVI, § 18. See, e.g., Govt. Code § 53553(e).
[30] Govt. Code §§ 53580 (defining refunding bonds as bonds issued to refund bonds), 53555 (requiring refunding bond proceeds to be deposited in escrow to refund original bonds), 53582 (prohibiting local agency from requiring escrow deposit of more funds than necessary to refund original bonds); see also Govt. Code § 53587 (permitting use of refunding bond proceeds for ancillary costs of refunding transaction).
[31] See City of Anadarko v. Kerr, 285 P. 975 (Okla. 1930); Com. exrel. Keller v. Cannon, 162 A. 277 (Pa. 1932). The Florida constitution expressly provides that voter approval is not required for bonds issued for the exclusive purpose of refunding bonds or interest thereon. Fla. const. art. 9, § 6; see City of Miami v. State, 190 So. 774 (Fla. 1939);Sullivan v. City of Tampa, 134 So. 211 (Fla. 1931).
[32] Other jurisdictions also recognize this distinction. See LawrenceCounty v. Jewell, 100 F. 905 (8th Cir. 1900) (under federal statute applicable to territorial bond refundings, refunding bonds could be issued for sole purpose of retiring existing debt, and proceeds could not be used for ulterior purpose.); City of Concord v. All Owners of TaxableProperty Within the City of Concord, 410 S.E.2d 482 (N.C. 1991) (refunding bonds may be issued without voter approval, but only if funds are used exclusively to retire existing debt); Bolich v. City ofWinston-Salem, 164 S.E. 361 (N.C. 1932) (same); Altafer v. Nelson, 9 Ohio C.D. 599 (1898) (bonds issued to pay redemption premium that was not originally contracted for are not refunding bonds under refunding statute).
[33] This opinion does not address the question whether proceeds from the sale of refunding bonds may properly be applied to the costs associated with their issuance, and nothing in this opinion should be read as concluding that such an expenditure would be illegal.
[34] See Educ. Code § 15100, final paragraph. See also Govt. Code §53506(a) (district may issue refunding bonds only as "authorized in accordance with the Constitution," which may be understood to incorporate the voter-approval requirement of Article XVI, section 18).
[35] See, e.g., Educ. Code § 53552.
[36] 112 Cal. 319. Teed was recently discussed and distinguished by the court of appeal in All Persons Interested,152 Cal. App. 4th at 1406-1407.
[37] Id. at 326-327.
[38] Teed, 112 Cal. at 324.
[39] Id.
[40] Id. at 325.
[41] Id. at 323.
[42] Teed, 112 Cal. at 329-330.
[43] Id. at 327.
[44] Id. at 325.
[45] See, e.g., Eugene McQuillin, The Law of Municipal Corporations
vol. 15, § 41.35, 526-528 and n. 2 (3d rev. ed., Thomson/West 2005); 45 pt. 2 Cal. Jur. 3d Municipalities § 534 (1999); 52A Cal. Jur. 3d PublicSecurities and Obligations § 59 (2001). Another case sometimes cited as establishing a refunding exception is City of Long Beach v. Lisenby,180 Cal. 52 (1919). See McQuillin, The Law of Municipal Corporations, at 525 n. 1. In Lisenby, the court held that the issuance of refunding bonds was permitted to pay a tort judgment. Involuntary indebtedness was clearly the focus of the opinion, and we are not inclined to read it more expansively than that. Cf. All Persons Interested,152 Cal. App. 4th at 1406-1407 ("In Lisenby . . . the original obligation had not been voluntarily incurred. Issuance of bonds was merely conversion of this involuntary debt from one form to another.")
[46] 152 Cal. App. 4th at 1407.
[47] See also Teed, 112 Cal. at 326-327.
[48] Id. at 327.
[49] Id. at 327. See People v. Scheid, 16 Cal. 4th 1, 17 (1997) ("[A]n opinion is not authority for a proposition not therein considered.")
[50] The term "bonded indebtedness" first appeared in article XIII A in 2000, in the amendments added by Proposition 39. Prop. 39, § 4, Gen. Elec. (Nov. 7, 2000). Although this term is not defined in article XIII A or elsewhere in the state's constitution, courts have defined "bonded indebtedness" as describing "those more formal transactions of both municipal and private corporations which require such prerequisites as elections or express approval of the stockholders in order for their creation and which, when issued, take the express form of bonds." ShastaCounty v. Trinity County, 106 Cal. App. 3d 30, 39 (1980) (citingHammond Lumber Co. v. Adams, 7 Cal. 2d 24, 27 (1936)). "Bonded indebtedness" is incurred once an approved bond has issued. Faulkner v.California Toll Bridge Authority, 40 Cal. 2d 317, 325 (1953); Clark v.City of Los Angeles, 160 Cal. 30, 44-45 (1911).
[51] See, e.g., 53550-53569, 53580-53589.5. Article 9 (commencing with section 53550) of the Government Code, permits the governing body of a local agency to issue refunding bonds "for the purpose of refunding any of the indebtedness of the local agency evidenced by bonds." (Id. at § 53551.) It is unclear whether sections 53580 through 53589.5 (Article 11), apply to the general obligation refunding bonds under discussion here or concern only "revenue bonds." (See § 53583(a) ["any local agency may issue bonds pursuant to [Article 11] . . . for the purpose of refunding any revenue bonds of the local agency"]; emphasis added. Cf. § 53581 ["notwithstanding the provisions of any other law, the provisions of [Article 11] apply to all refunding bonds of any local agency"].) General obligation bonds are plainly not the same as revenue bonds. (See, e.g., City of Redondo Beach v. Taxpayers, Property Owners, Citizensand Electors of City of Redondo Beach, 54 Cal.2d 126, 131-133 (1960) [clear distinction between the two].)
[52] See, e.g., In re Marriage Cases, 43 Cal. 4th 757, 852 (2008).
[53] See City of Palm Springs v. Ringwald, 52 Cal. 2d 620, 623
(1959).
[54] Metro. Water Dist. v. Dorff, 138 Cal. App. 3d 388, 398 (1982) (citing Eastern Mun. Water Dist. v. Scott, 1 Cal. App. 3d 129, 135
(1969)).
[55] Cal. Const. art. XVI, §§ 18(a) and 18(b).
[56] See note 51 ante.
[57] Golden Gate Bridge v. Filmer, 217 Cal. at 760-762.
[58] If a district artificially raised a bond's interest rate for the purpose of generating a premium, the district might thereby increase the taxpayers' burden (unless, for example, the principal amount of the bonds or some other variable were reduced to offset the premium), because taxpayers would thereafter be paying more debt service on the refunding bonds than would have been required under market conditions at the time the bonds were sold. Under those circumstances, the district would be acting inconsistently with the rule stated in Golden Gate Bridge, and at cross purposes with the announced legislative purpose of Article 9 refunding bonds to "permit the lowering of property tax rates. . . ." 1972 Cal. Stats. ch. 531, § 17.
[59] § 53552.
[60] See discussion page 14 ante.
[61] § 53551.
[62] See Franklin and Prendergast, Glossary of Public FinanceTerminology 32 (3rd ed., 1992) (defining "proceeds" as "[t]he money the issuer receives upon initial delivery of an issue, being par value, plus premium or less discount, and plus accrued interest"). See also, e.g.,City of Oakland v. Williams, 107 Cal. App. 340, 341 (1930) (it "would not seem to be open to dispute" that "when bonds are sold for more than their par value the entire purchase price, including the premium, constitutes the proceeds of the bonds").
[63] Government Code section 29303 states in part:
 Whenever any bonds issued by . . . any school . . . district in any county, whose accounts are required by law to be kept by the county auditor and treasurer, are sold at a premium or with accrued interest, or both, the amounts received for the premiums and accrued interest shall be deposited in the debt service fund of the county or district unless it is expressly provided by law that they be deposited in some other fund.
Black's Law Dictionary at 434 defines "debt service" as: "1. The funds needed to meet a long-term debt's annual interest expenses, principal payments, and sinking-fund contributions. 2. Payments due on a debt, including interest and principal." Cf. Cal. Const. art. XIII B, § 8(g). In section 29303, the referenced "debt service fund" would thus be applied to payments on the bonds that generated the premium.
[64] In any event, even if section 29303 did govern Article 9 premiums, school districts would not be permitted to apply those funds to construction projects or other purposes; rather, the premium would be deposited in the district's debt service fund.
[65] But see footnote 33, ante, leaving open the question whether, under the debt limit, proceeds from refunding bonds issued without voter approval may be applied to costs of issuance. Cf. § 53556 (permitting costs of issuance to be paid from proceeds of bond sales).
[66] Furthermore, such an increase in tax rates or an unnecessary perpetuation of an inflated rate would likely conflict with a district's duties to obtain the best terms available and to lower the burden on district taxpayers when possible, as explained previously.
[67] Sutro, 74 Cal. 332, 337.
[68] Bd. of Supervisors of Merced Co. v. Cothran, 84 Cal. App. 2d 679,681 (1948).
[69] All Persons Interested, 152 Cal. App. 4th 1386, 1406-7.
[70] See also Govt. Code §§ 53511, 53589.5.
[71] Plan. Conserv. League v. Dept. of Water Resources, 83 Cal. App. 4th 892, 922 (2000).
[72] Code Civ. Proc. §§ 863, 864, 869.
[73] Cal. Commerce Casino, Inc. v. Schwarzenegger,146 Cal. App. 4th 1406, 1420 (2007) (quoting City of Ontario v.Super. Ct. of San Bernardino Co., 2 Cal. 3d 335, 341-342 (1970) (emphasis in original)).
[74] Comm. for Responsible Sch. Expansion, 142 Cal. App. 4th at 1186;Foothill-De Anza, 158 Cal. App. 4th at 24.
[75] McLeod v. Vista Unified Sch. Dist., 158 Cal. App. 4th 1156, 1171
(2008) (60-day statute of limitations applies when challenged matter pertains to validity of bonds).
[76] See Sundance v. Mun. Ct., 42 Cal. 3d 1101, 1138-1139 (1986);McKinny v. Bd. of Trustees, 31 Cal. 3d 79, 91 (1982); McLeod v. VistaUnified Sch. Dist., 118 Cal. App. 4th at 1165-1170; TRIM, Inc. v. Co.of Monterey, 86 Cal. App. 3d 539, 542 (1978) (taxpayers have standing to challenge illegal expenditures by county officials under section 526a, and may also enjoin wasteful expenditures).
[77] See, e.g., Pierce v. Super. Ct., 1 Cal. 2d 759, 761-762 (1934);81 Ops.Cal.Atty.Gen. 281, 291-292 (1998).
[78] An example might go as follows. Suppose the district sells the JPA $90 million of the district's refunding bonds at par value (i.e., without a premium) but bearing an above-market interest rate. The JPA then sells $100 million in revenue bonds, at the market interest rate, to investors. Because of the above-market interest rate on the district's bonds, the debt service on the district's bonds — paid to the bond holder JPA — is designed to be sufficient to pay the debt service on the JPA's revenue bonds. Meanwhile, after selling its $100 million in bonds and purchasing the district's $90 million in bonds, the JPA would have $10 million remaining for expenditure on local capital improvements or public buildings (see Govt. Code § 6546(c)), such as additional school facilities. Assuming that there had been a sufficient decline in market interest rates for bonds over a period of years, the school district's issuance of its refunding bonds in this example could theoretically reduce the district's overall debt service, yet the construction of additional school facilities would be funded by the JPA's revenue bond proceeds. In such a market, however, the district's debt service could be even further reduced in the absence of the proposed JPA arrangement.
[79] Joint Exercise of Powers Act, Govt. Code §§ 6500-6599.3
[80] We have not been asked to examine the powers of a JPA or the validity of the JPA actions described in this hypothetical transaction, and we express no views on that subject. We limit our analysis and opinion to the proposed conduct of a school district.
[81] Govt. Code § 6502; 83 Ops.Cal.Atty.Gen. 82, 83 (2000).
[82] Govt. Code § 6503.5; see Rider v. City of San Diego,18 Cal. 4th 1035, 1055 (1998).
[83] Id. at §§ 6584-6599.3.
[84] Id. at § 6586.
[85] Id. at § 6589 *Page 1